IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| EMMERICH NEWSPAPERS, INCORPORATED | PLAINTIFF |
| VS. | CIVIL ACTION NO. 3:21CV32 KHJ MTP |
| PARTICLE MEDIA, INC. D/B/A NEWS BREAK and JOHN DOES 1-10 | DEFENDANTS |

MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR
PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF FAIR USE

COMES NOW Plaintiff Emmerich Newspapers, Incorporated ("Emmerich"), by and through counsel of record, pursuant to F.R.C.P. Rule 56, which files this Memorandum in Support of its Motion for Partial Summary Judgment on the issue of fair use.

**STANDARD**

"Summary judgment is appropriate if the record evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Fed.R.Civ.P. 56(a); *Robinson v. Orient Marine Co.*, 505 F.3d 364, 366 (5th Cir. 2007). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986). In determining whether a genuine dispute of material fact exists, the court views "all facts and evidence in the light most favorable to [the nonmovant] and draw[s] all reasonable inferences in [the non movant's] favor." *Voss v. Goode*, 954 F.3d 234, 237 (5th Cir. 2020).

**A. PARTICLE MEDIA'S UNAUTHORIZED PUBLICATION OF EMMERICH'S IMAGES, HEADLINES AND LEDES IN PARTIAL FORM ON ITS NEWSFEED AND IN FULL-TEXT VERSION ON ITS WEBSITE, IS NOT PROTECTED UNDER THE DOCTRINE OF FAIR USE.**

Fair use is typically a jury question. *See Compaq Computer Corp. v. Ergonome Inc.,* 387 F.3d 403, 409 (5th Cir. 2004) (no error in refusing to grant plaintiffs motion for judgment as a matter of law as

to fair use and allowing jury to decide); *Midlevelu, Inc. v. ACI Info. Grp.*, 989 F.3d 1205,1221 (11th Cir. 2021)(no error in allowing jury to decide issue of fair use); *Arriola v. Joey Jordison,* Civil Action No. 3:99CV107-B-A (N.D. Miss. 2000) (N.D. Miss. 2000) ("the court believes that the final decision regarding fair use should be left to a jury"). However, in this case the undisputed facts are so clear the Court must rule that fair use does not apply as a matter of law.

Furthermore, the burden of proof is on the Defendant to establish the fair use affirmative defense. *Estate of Barr v. Carter*, 272 F.Supp.3d 906 (E.D. La. 2017). With that in mind, it is important to note three critical facts:

### 1. *Particle told its potential investors that news aggregation of the type it performs may not be legal.*

In a context where giving false assurances can be met with serious consequences, Particle told potential investors that, "to the company's knowledge, the jurisprudence has not definitively resolved whether news aggregation is fair use under the law." [See Ex. "A,"Mazzola Transcript, p. 90]. When asked if he was aware of any new jurisprudence which would change that conclusion, Particle's corporate attorney stated, "I am not aware of any specific case that's on point here with respect to news aggregation." [Mazzola Transcript, pp. 90-91].

### 2. *Particle's own corporate attorney admitted under oath that its practice of publishing other websites' content may not be legal.*

Furthermore, when asked about the legality of Particle's practices in particular, Mr. Mazolla was even more definitive:

> The jurisprudence has not definitely resolved whether the practices by Particle Media, or the company, with respect to how it will aggregate and display news, has not been resolved by any -- any, like, binding precedent that would apply to the specific factual circumstances of how our app works.

[Mazolla Transcript, p. 86].

### 3. *Particle's own expert admitted his former employers would not consider Particle's practices legal.*

Particle's own expert, called for the purpose of analyzing the legality of Particle's practices, admitted that scraping photos from Emmerich websites (not the headlines or ledes) and reproducing them on its own news feed would not be considered legal by either of his former employers, the Associated Press and Getty Images. When asked how the Associated Press would respond if its photos had been reproduced by Particle in the manner followed here, he responded, "If we saw a lot of use of these thumbnails, we might have contacted that organization and . . . get them to license the content or take it down." [Ex. B, Sell Transcript, p. 64]. And if Particle refused, he stated AP would ultimately "follow up with a cease and desist letter." *Id*. He stated that Getty Images "would go through the same process as I described with AP." [Sell Transcript, p. 65].

Of critical importance, Particle's expert was only opining about the legality of scraping Emmerich's *photos* - not its headlines or ledes. Obviously Particle does much more than that - at a minimum publishing both the photo and headline, and regularly including the first 50 words or 20% of the article, whichever is less. [Mazolla Transcript, p. 81]. To the extent Particle believes it has now inoculated itself against allegations of copyright violation by only including images and headlines on its news feed, and omitting the lede, their own expert witness will testify against them.

When Particle has advised its own investors that what it is doing may not be legal, and when its in-house attorney and corporate representative admits that what Particle is doing may not be legal, and when its own expert witness says that what they are doing would not be considered legal by his prior employers, Particle cannot argue with a straight face today that its practices are protected by fair use.

**B.     OVERVIEW OF PARTICLE'S BUSINESS PRACTICES**

Particle's entire business model consists of making money off of other people's news content. The NewsBreak news feed is nothing more than a steady stream of headlines, pictures and content taken verbatim from real publishers like Emmerich, interspersed with Particle's own ads. No ads from the originating website appear on Particle's news feed - only the ads placed by Particle.

Particle did not purchase its web crawler "off the shelf." It employs its own team of software engineers to design and operate its system - "the employees at Particle Media are the ones that have

developed this -- this code for the web crawler." [Mazzola Transcript, p. 33]. Particle has revenue-sharing agreements with approximately 140 "partners" who allow Particle to scan their websites and display full-text copies of their content on Particle's website. [Mazzola Transcript, p.37]. However, Particle gathers news content from thousands of other non-partner websites (such as Emmerich) and stores their content on its website as well. [Mazzola Transcript, p. 38]. Particle's corporate counsel testified, "I don't believe the web crawler knows how to distinguish" between partner and non-partner websites. [Mazzola Transcript, p. 38]. He openly acknowledged, "There are publishers we don't have agreements with that we crawl and then display a portion of their content." [Mazzola Transcript, p. 48].

Particle's software engineer, Randy Zhong, testified that Particle intentionally identified Emmerich's websites as a potential source of news articles by following links from other websites and searching the web using Google Search:

> Q. How does the web crawler decide which websites to gather articles from?
>
> . . . .
>
> A. We start the crawler from a list of popular websites such as Google, CNN, Fox News, and we start from those seed websites and follow the outlinks to get other website. . . . We started from well known websites such as Google, and we use Google Search to search the website such as CNN, Fox News.
>
> . . . .
>
> We start from Google and a few top website at the beginning and follow the outlink.· So Emmerich's website must be in some of the outlinks of the popular page. That's how we discovered Emmerich's website.

[Ex. C, Zhong Transcript, pp. 20-21].

Mr. Zhong readily admitted that Particle's web crawler makes no distinction between websites operated by its partners, and websites operated by non-partners - it vacuums up all the available information either way:

> Q. What if there is a non-partner website that has an RSS feed?· Is that website treated any differently from a partner website?
> (Question translated.)
> A. Yeah, as far as the crawler is concerned, if we have RSS, we will use it. From the crawler point of view, they are the same.

4

[Zhong Transcript, p. 24].

And he acknowledged that Particle's web crawler did, indeed, consume *everything* on Emmerich's websites:

> Q. Okay. When the web crawler identifies a news article, does it consume the entire article or just portions of it?
> (Question translated.)
> A. The input to the parser is a whole web page, and we try to extract headline, image, and content.
> Q. I want to make sure I understand the first part of your response. Did you say that you -- you -- the web crawler consumes the entire web page?
> (Question translated.)
> A. Yes.

[Zhong Transcript, pp. 24-25].

Mr. Zhong also admitted Particle's web crawler consumes content from websites (like Emmerich) which do not have RSS feeds:

> Q. How does the web crawler consume articles from non-partner websites which do not have RSS feeds?
> (Question translated.)
> A. This diagram shows the process. It starts with the web. It will have a web page. It will collect, parse it, and save the headline, image, content to the database.
> Q. My question is, if there is no RSS feed, how do you extract the content?
> (Question translated.)
> A. We look at the HTML, the HTML code. It has this HTML text where it indicate some text could be headline, some text could be content.

[Zhong Transcript, pp. 19-20].

Mr. Zhong admitted that Particle's web crawler consumes all of the content from news websites without any alteration:

> Q. Randy, when the parser extracts the image from the website, does it alter the image in any way?
> . . . .
> (Question translated.)
> A. No, it does not.
> Q. Okay. When it extracts the headline, does it alter the headline in any way?
> THE INTERPRETER:· Give me a second to translate. . .
>  Q. Let's use the word "title."· When the parser extracts the title, does it alter it in any way?
> (Question translated.)
> A. No.
> Q. And when the parser extracts the actual content, the first 20 percent of the article, does it alter it in any way?

> (Question translated.)
> A.     No.

[Zhong Transcript, pp. 20-21].

After copying all of the content from the targeted website, Particle then stores all of this information on its own server:

> Q.     Okay.· Is all of the information which is extracted then stored on Particle Media's server?
> (Question translated.)
> A.     We extract headline, image, content. . . . Yeah, we still -- we save those information in our database.

[Zhong Transcript, p. 27].

Then, when a reader using the Newsbreak app logs on, the app simply regurgitates everything it purloined from the publisher's website:

> Q.     Now, once the headline and image and content are stored on your database, please describe how the news feed works.
> (Question translated.)
> A.     Yeah, so that happened inside the app. So when the user go into our app, it will start refresh to get article.  We fetch the news from the database and display them to the user.

[Zhong Transcript, p. 29].

Particle describes the shortened version of the purloined articles which appear first in its news feed as "snippets," which consists of the verbatim article headline, the lead photograph and the first 50 words or 20% of the article "whichever is less." [Mazzola Transcript, p. 81].

Mr. Zhong admitted that advertisements which originally appeared adjacent to the articles on Emmerich's website do not automatically appear in the same story published on Newsbreak:

> Q.     Do any ads from the originating website appear on the news feed?
> (Question translated.)
> A.     They are not guaranteed to display.· If they are -- we generate content as headline, image, and text content.  If the advertisement is a single text, it could be displayed.

[Zhong Transcript, p. 29]. In point of fact, Emmerich's ads never appeared on either the Particle's news feed or in the full text stories which Particle ran over 17,000 times.

6

Particle's expert admitted that Particle never shares any revenue from ads appearing on its news feed with the original publishers of the articles: "There is no situation in which News Break would share revenue with any publisher from its news feed ads." [Ex. D, Zoltowski Transcript, p. 23]. "My understanding is that revenue would be generated and that News Break does not share that revenue with publishers and never has as part of its business model." [Zoltowski Transcript, p. 27].

Particle's display of Emmerich's content on its Newsbreak news feed, without permission or alteration, was only the first instance of copyright violation which was not protected by fair use. Particle has admitted that all or a portion of at least 33,966 Emmerich articles appeared on its website [Mazzola Transcript, p. 20].

Particle has admitted that on at least two extended occasions, the first from July through December of 2019, and the second from May through December of 2020, it allowed users to read the full text of Emmerich articles on Particle's website. [Mazzola Transcript pp. 52-54]. According to Mr. Mazzola, "[T]here were 33,966 articles that were total, and there were -- about 17,000 of those were full text." [Mazzola Transcript, p. 67].
Particle has admitted that, during these time frames, there were *3,791,732* page views of Emmerich content on its website, including approximately *1.7 million* page views of full text articles. [Mazzola Transcript, p. 72-76].

Particle's corporate counsel admitted that "there wasn't an immediate cessation of the practice" after it was allegedly discovered the first time. [Mazzola Transcript p. 53]. During these time frames, readers on the news feed who "clicked through" did not go to Emmerich's originating website, but were allowed to view full-text versions of the Emmerich articles which were displayed on Particle's website with virtually none of Emmerich's ads displayed.

Particle has argued this was simply a "glitch," resulting when their programmers "were trying to address a functionality issue relating to the display of certain non-mobile-friendly content." [Mazzola Transcript, pp. 51-52].

Three facts are of crucial importance in assessing the truthfulness of Particle's claim of a "glitch." First, despite the massive number (over 17,000) of full-text publications which occurred over a two year period, Particle never reached out to Emmerich or notified Emmerich of the mistake:

> Q. Okay. Did Particle Media notify Emmerich that their articles - Emmerich's articles had been published on Particle Media's website in error?
> A. No. I do not believe there were any notifications to any Emmerich parties.

[Mazzola Transcript, p. 56]. Second, Particle was unable to identify one single other publisher whose websites were similarly affected:

> Q. Were any other websites affected in this regard other than Emmerich?
> A. I'm not aware of any specific websites.

[Mazzola Transcript, p. 54]. It is simply preposterous to argue that a software glitch would affect every one of Emmerich's separate websites but no other websites.

Third, despite the massive violation of Emmerich's copyright on at least two separate occasions over the course of two years, Particle could not identify a single employee who was sanctioned or disciplined in any way. [Mazzola Transcript, p. 57]. Taken together, these facts clearly demonstrate that the publication of Emmerich's articles were wilful, and not a glitch.

Particle admits that every one of the 17,000 Emmerich articles which could be viewed in full text on its website (including but not limited to the nine registered articles) appeared first on its news feed:

> Q. Now, with regard to the articles that were consumed in full text and then placed in full text on Particle's website, a reader would first see the snippet for that particular article on Particle's list page, correct?
> A. Yes.

[Mazzola Transcript, p. 71]. As noted above, the "snippet" consisted of the headline, the photo and the first 50 words or 20% of the content, whichever was less. As a result, this constituted two separate instances of infringement for each article (once when it displayed in abbreviated form and a second time when it displayed in full-text).

Mr. Zhong acknowledged that when a reader "clicks through" to read the full story, thinking they are going to the website where the story originated, Particle regularly "frames" the display within its own website, where it superimposes its own ads into the article:.

> Q. When a reader clicks through on the newsfeed, they see the full article. Is the article actually framed on Particle's website?
> (Question translated.)
> A. For -- currently for partners, the content are housed in our web server. But for non-partners, we show a link. When the user click, a link will be rerouted to the original website. . . . If the content is from a partner publisher, we self-host it. If it is not a partner publisher, it will be directed to the original website.

[Zhong Transcript, pp. 29-30].

Particle admits that, although Emmerich is not and never has been one of its "partners," for two prolonged periods in 2001 and 2002 it published thousands and thousands of Emmerich articles in full-text format framed on its own website.

**C.   LEGAL ANALYSIS**

"To establish copyright infringement, a plaintiff must prove ownership of a valid copyright and copying of constituent elements of the work that are copyrightable." *Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1340 (5th Cir.1994) (citing *Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1999)). Copyright ownership is shown by (1) proof of originality and copyrightability and (2) compliance with the applicable statutory requirements. *Id*. *Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 407-08 (5th Cir. 2004).

There is no dispute that Emmerich possessed statutorily compliant copyrights in nine of the 15 articles cited in the Second Amended Complaint.

Not all copying amounts to copyright infringement, however. *Eng'g Dynamics*, 26 F.3d at 1340-41. Particle contends that its conduct is protected under the doctrine of "fair use," which Congress has declared an exception to the law of copyright protection under 17 U.S.C. § 107. The Copyright Act provides that "the fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an

infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include --

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work."

17 U.S.C. § 107 (2000). *Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 408 (5th Cir. 2004). The first and fourth enumerated factors are generally more significant than the second and third. Authors Guild v. Google, Inc., 804 F.3d 202, 213-14 (2d Cir. 2015). The purposes listed in the statute are "illustrative and not limitative," and the four factors specified are similarly not exclusive of other considerations. Castle Rock Ent., Inc. v. Carol Pub. Grp., Inc., 150 F.3d 132, 141 (2d Cir. 1998). "The ultimate test of fair use, therefore, is whether the copyright law's goal of 'promot[ing] the Progress of Science and useful Arts,' U.S. Const., art. I, § 8, cl. 8, 'would be better served by allowing the use than by preventing it.'" Id. (citing Arica Inst., Inc. v. Palmer, 970 F.2d 1067, 1077 (2d Cir. 1992)). "The task is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case-by-case analysis." Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 577 (1994). The fair use determination depends on the totality of the factors considered. *Id*. at 584; Compaq Computer Corp. v. Ergonome Inc., 387 F.3d 403, 409-10 (5th Cir. 2004).

    The first fair use factor is, "the purpose and character of the use, including whether such use is of a commercial nature or is for non-profit educational purposes." The Supreme Court has noted that "[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row, Publishers, Inc. v. Nation Enters*., 471 U.S. 539, 562, 105 S.Ct. 2218,

85 L.Ed.2d 588 (1985). The Fifth Circuit has stated that "Commerciality generally weighs against finding fair use ..." *Compaq Computer Corp. v. Ergonome Inc.,* 387 F.3d 403, 409-10 (5th Cir. 2004).

There is simply no question that Particle was attempting to, and in fact did, profit from its unauthorized publication of Emmerich's articles. Its entire income stream is derived from ads placed around the content which it scrapes from websites operated by publishers like Emmerich. In fact, Particle produced an expert witness to testify to precisely the amount of profit Particle derived from the publication of Emmerich's works (although he only focused on profits from the full-text articles, since he testified that Particle never shared revenue derived from its news stream). [Zoltowski Transcript, pp. 48-51].

Additionally, "the first factor of the fair use analysis poses a deceptively simple question. It asks "whether the new work merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning or message; it asks, in other words, whether and to what extent the new work is transformative." *Campbell*, 510 U.S. at 579, 114 S.Ct. 1164 (citation omitted); *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F.Supp.2d 537, 551 (S.D. N.Y. 2013). "[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Campbell,* 510 U.S. at 579, 114 S.Ct. 1164. Stated differently, a "use of copyrighted material that merely repackages or republishes the original is unlikely to be deemed a fair use" and a "change of format, though useful" is not transformative. *Associated Press v. Meltwater U.S. Holdings, Inc*., 931 F. Supp. 2d 537, 551 (S.D.N.Y. 2013).

Particle makes no pretense of "transforming" Emmerich's articles in any way at all. Particle's own software programmer testified that Particle made no alterations at all to Emmerich's headlines, photos or content. Neither their appearance as "snippets" on the news feed nor their presentation as full-text articles after "clicking through" is anything other than direct copying of Emmerich's content.

This factor clearly weighs against a finding of fair use.

The second prong of the fair use analysis is "the nature of the copyrighted work." Factual news stories receive less protection than works of fiction. "The Supreme Court has noted that "fair use is more likely to be found in factual works than in fictional works.' *Stewart v. Abend*, 495 U.S. 207, 237, 110 S.Ct. 1750 1769, 109 L.Ed.2d 184 (1990); *Compaq Computer Corp. v. Ergonome Inc.,* 387 F.3d 403, 410 (5th Cir. 2004).

The Emmerich articles scraped by Particle included both hard news and editorial content, which is more like fiction than hard news. Virtually the exact same fact situation existed in *Meltwater*, where the Court concluded definitively that fair use did not apply. This factor is at worst neutral, and based on *Meltwater* should weigh against a finding of fair use.

The third prong of fair use analysis is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." With regard to the full text publication which occurred, there is simply no question this prong favors Emmerich - Particle republished 100% of Emmerich's articles at least 17,000 times. And with regard to the "snippets" published on Particle's news feed, Particle's policy is to quote up to 20% of the first part of the article, verbatim, or up to 50 words, whichever is less. This amount exceeds anything which has ever been allowed under fair use in any other jurisdiction. Furthermore, even if an infringer takes a small portion of a work, copying will not be a fair use if the portion taken is the "heart" of the work. Emmerich characterized the lede (i.e., the first part of every story) as "the most important part of our story." [Emmerich Transcript, p. 69].

The fourth prong of the fair use analysis is "the effect of the use upon the potential market for or value of the copyrighted work." The Supreme Court states that this factor represents the most important aspect of fair use. *Harper & Row*, 471 U.S. at 566, 105 S.Ct. at 2233. This factor requires courts to consider not only actual harm to the market for the original, but also whether widespread use of the work would impair the potential market for the original work and any derivative works. *Campbell*, 510 U.S. at 590, 114 S.Ct. at 1177; *Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 410 (5th Cir. 2004).

Wyatt Emmerich testified at length on the damaging impact Particle's practices have had on his business revenue. He stated that there have been "innumerable conversations between our ad reps and

advertisers about why they won't buy an ad because they have cheaper alternatives through the ad networks" which sell ads on Particle's platform (i.e., Google Ads). [Emmerich Transcript, p. 152]. He noted that his newspapers experienced a steady decline in operating revenue, from $22.5 million to a low of $14.5 million, over the period of time Particle has been in operation and stealing his articles. [Emmerich Transcript, p. 178-79]. He noted that "since NewsBreak has stopped stealing our stuff, our revenue stabilized for the first time in three or four years." [Emmerich Transcript, p. 184].

There can simply be no argument that this prong weighs heavily in Emmerich's favor on the question of fair use.

Taken as a whole, there is simply no question that Particle's practices are not allowable under the doctrine of fair use, and the Court should rule that fair use does not apply as a matter of law.

RESPECTFULLY SUBMITTED, this the 3rd day of May, 2022.

EMMERICH NEWSPAPERS, INCORPORATED

BY: /s/ Wilson H. Carroll
Wilson H. Carroll (MSB#5894)

OF COUNSEL:
Wilson H. Carroll
WILSON CARROLL, PLLC
2506 Cherry Street
Vicksburg, Mississippi 39180
(601)953-6579
wilson@wilsoncarroll.com

## CERTIFICATE OF SERVICE

I hereby certify that I have this day filed the foregoing document via the Court's automated filing system, which automatically sent a copy to all counsel of record.

Dated: May 3, 2022.

*/s/Wilson H. Carroll*
Wilson H. Carroll