## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

EMMERICH NEWSPAPERS,                                    PLAINTIFF
INCORPORATED

V.                                    CIVIL ACTION NO. 3:21-CV-32 KHJ-MTP

PARTICLE MEDIA, INC. D/B/A NEWS                        DEFENDANT
BREAK and JOHN DOES 1-10

---

## PARTICLE MEDIA, INC.'S MEMORANDUM IN SUPPORT OF ITS
## RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL
## SUMMARY JUDGMENT ON THE ISSUE OF FAIR USE

---

The Court should deny Plaintiff Emmerich Newspapers, Inc.'s motion for summary

judgment on the issue of fair use because, for the reasons discussed below and in Defendant

Particle Media, Inc.'s ("Particle Media") Motion for Partial Summary Judgment on Fair Use

[Doc. 65] and brief in support [Doc. 66], which are adopted and incorporated herein by

reference, Particle Media made fair use of certain limited portions of Plaintiff's registered works

on the NewsBreak news feed,[1] and, thus, it "is not an infringer of the copyright[s] with respect to

such use." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 433 (1984).

### FACTUAL AND PROCEDURAL BACKGROUND

Particle Media designed and developed NewsBreak, a website and application ("app")

that provides users with, among other things, a personalized feed of content and information,

including local, state-wide, national, and international news and a forum to engage with such

content, and provides publishers with tools and platforms to manage the content and connect

---

[1] As discussed below (*infra* at 19), Particle Media does not contend that unintentional uses of full-text articles were within the scope of the fair use defense, and thus the Court should deny Plaintiff's motion as moot with respect to such uses.

with users. *See* Ex. 1, Mazzola Decl. at ¶3. NewsBreak indexes and links to original and third-party news content, making it easier for users to search, browse, and find content of interest and widening publishers' exposure to a broader network of readers. *Id*. Put simply, NewsBreak helps users discover content without having to undertake voluminous searches by pushing content to the users based on their indicated preferences and interests. *Id*.

During the period relevant to this lawsuit, users who opened NewsBreak viewed a news feed that, for each listed story, presented a headline and/or a thumbnail image and/or the first limited words of the article (sometimes referred to as a "snippet"), all intended to promote the story. *See* Ex. 1, Mazzola Decl. at ¶7. As a result of subsequent changes to the NewsBreak product,[2] today the news feed includes only a headline and/or a thumbnail image. *Id*. When a user clicks on a story on the news feed, they either view the full article on NewsBreak, in the case of original content generated by NewsBreak or fully-hosted articles of publishers and contributors with whom Particle Media has licensing agreements,[3] or they are taken to the publisher's own website (*i.e.*, the source of the article), with NewsBreak acting as a web browser. *Id*. at ¶8. NewsBreak is free to users. *Id*. Ads and sponsored content appear on NewsBreak on the news feed and in relation to the full articles. *Id*.

Plaintiff is a privately-owned company that owns and operates companies that in turn publish newspapers in Mississippi, Louisiana, and Arkansas and run associated websites. *See* [Doc. 23] at 3. Prior to 2022, stories from some of these publications appeared on the NewsBreak news feed in the form of a headline, a thumbnail image and/or the first limited words of the article. *See* Ex. 1, Mazzola Decl. at ¶12. Also prior to 2022, there were times during

---

[2] Particle Media stopped using snippets for product design reasons unrelated to this case. *Id*. at ¶7.
[3] Particle Media has entered into agreements with more than 100 publishers (who operate thousands of websites) allowing Particle Media to display their content in full on NewsBreak. *Id*. at ¶8, n. 1.

which, in error, articles from Plaintiff and other non-partner publishers were inadvertently available in full on the NewsBreak app on Android devices.[4] *Id.* In those limited instances, users on Android devices were not directed from the news feed to the publishers' websites but rather viewed the full articles within the app. *Id.*

In or around the summer of 2020, Plaintiff learned of Particle Media's use of its content. *See* Ex. 2, Emmerich 30(b)(6), at 53:8-56:21. In August 2020, Plaintiff registered nine articles with the U.S. Copyright Office: (1) "Carroll County School District to start August 13" (TX0008895928; text); (2) "Citizen tip leads to drug arrest" (TX0008893938; text, photograph); (3) "City puts new water billing system to use" (TX0008890616; text); (4) County will pursue more virus aid (TX0008903548; text); (5) "MSU extension collecting unsolicited seed" (TX0008893936; text, photograph); (6) "Pillow grad enjoys job in AC repair" (TX0008890595; text, photograph); (7) "Some school board members waiting to make decision on fall sports vote" (TX0008890631; text); (8) "Uptown mall wants downturn in taxes" (TX0008890620, text); and (9) "Virus hospitalizations down, but cases continue to surge" (TX0008891074, text) (collectively, the "Registered Works"). *See* Ex. 3, Registration Certificates. Each of these articles appeared on both the NewsBreak news feed and, in some instances, in full text on the NewsBreak app. *See* Ex. 1, Mazzola Decl., at ¶15.

Months later, on January 15, 2021, Plaintiff filed this lawsuit against Particle Media alleging copyright infringement, tortious interference with business relationships, civil conspiracy, and unjust enrichment, and seeking compensatory and punitive damages and a preliminary and permanent injunction enjoining Particle Media from infringing its copyrights. *See* [Doc. 1]. Plaintiff filed a First Amended Complaint on September 26, 2021, stating that its

---

[4] The error did not affect iOS devices (i.e., iPhones) or the website. *Id.* at ¶12, n. 3.

allegations of copyright infringement apply to every instance where Particle Media extracted Plaintiff's articles, in whole or in part, and republished them on the NewsBreak app, and requesting a ruling that Particle Media infringed Plaintiff's copyrights in registered and unregistered works. *See* [Doc. 23] at 15, ¶A.

On October 12, 2021, Particle Media filed its Partial Motion to Dismiss Plaintiff's First Amended Complaint as to Plaintiff's Copyright Infringement Claims for Unregistered Works and Plaintiff's State Law Claims, arguing Plaintiff's claim for copyright infringement should be dismissed as to unregistered works and Plaintiff's state law claims should be dismissed because they were preempted by federal copyright law. *See* [Doc. 29]. The Court granted the motion on March 21, 2022, holding all that remains is Plaintiff's copyright infringement claim as to its Registered Works and its request for injunctive relief. *See* [Doc. 55]. It is undisputed that Particle Media no longer uses headlines, photographs, or snippets from any of Plaintiff's websites, and Plaintiff has acknowledged there is no current conduct by Particle Media it is seeking to enjoin. *See* Ex. 1, Mazzola Decl. at ¶14; Ex. 2, Emmerich 30(b)(6) at 196:1-6.

The Court should now reject Plaintiff's request for summary judgment in its favor as to Particle Media's fair use defense because all four of the statutory fair use factors favor Particle Media. *First*, its use of Plaintiff's works on its news feed was transformative, as it served a new purpose and provided a public benefit. *Second*, the Registered Works are factual in nature and thus entitled to narrower protection than fictional or creative works. *Third*, a comparison of the news feed snippets to the full-text articles at issue shows that the quantity and quality of the material used was reasonable in relation to Particle Media's purpose, as the snippets did not use the heart of the articles or the part most likely to be newsworthy and would not fulfill demand for the original. And as to the thumbnail images, the third factor is entitled to less weight when

4

considering a photograph, where all or most of the work often must be used in order to preserve any meaning, than where parts of a work can be excerpted without losing all value. *Finally*, the news feed did not usurp or substitute for the market for the originals, but rather directed users to Plaintiff's websites. Accordingly, Particle Media, not Plaintiff, is entitled to summary judgment on fair use.

## <u>STANDARD</u>

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if, under the applicable substantive law, 'its resolution could affect the outcome of the action.'" *Patel v. Tex. Tech Univ*., 941 F.3d 743, 747 (5th Cir. 2019) (quoting *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010)). "An issue is 'genuine' if 'the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party.'" *Jones v. United States*, 936 F.3d 318, 321 (5th Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In analyzing a motion for summary judgment, the Court does not "weigh the evidence and determine the truth of the matter," *Klocke v. Watson*, 936 F.3d 240, 246 (5th Cir. 2019) (quoting *Anderson*, 477 U.S. at 249), but only determines whether there is a genuine issue for trial when viewing the evidence in the light most favorable to the party opposing summary judgment. *Duval v. N. Assur. Co. of Am.*, 722 F.3d 300, 303 (5th Cir. 2013). When viewed in the light most favorable to Particle Media, there clearly are genuine issues that compel the denial of Plaintiff's motion.

## ARGUMENTS AND AUTHORITIES

### A. At least two of Plaintiff's works at issue are not protectable under copyright.

As an initial matter, Plaintiff cannot show infringement as to certain of the works at issue in this case, such that its motion should be denied as to those works for this reason alone.

To prove copyright infringement, Plaintiff must show "(1) ownership of a valid copyright, and (2) copying [by the defendant] of constituent elements of the work that are original." *See Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004) (quoting *Feist Publ'ns., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) (alteration in original)). "Copyright ownership is shown by proof of originality and copyrightability in the work as a whole and by compliance with the applicable statutory formalities." *Engineering Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1340 (5th Cir. 1994) (citation omitted). *See also Norma Ribbon & Trimming, Inc. v. Little*, 51 F.3d 45, 47 (5th Cir. 1993). Copyright registration certificates "create only a rebuttable presumption that the copyrights are valid." *Norma Ribbon*, 51 F.3d at 47 (quoting 17 U.S.C. § 410(c)).

As stated above, this case concerns nine articles Plaintiff registered with the U.S. Copyright Office. *See supra* at 3. At issue in Plaintiff's motion is Particle Media's use of headlines, photographs and limited excerpts of those nine works on its news feed in the NewsBreak app. Because Plaintiff cannot show that it owns valid copyrights in (1) the headlines for its nine articles and (2) the photographs used in two of those articles, Plaintiff cannot show that Particle Media infringed those works.

Regarding the headlines, they are quintessential short words and phrases and should be excluded from copyright protection as a matter of statutory construction. *See* 37 C.F.R. § 202.1(a).  At the very least, there is a factual issue as to whether they are even protectable.

As to the photographs incorporated in the nine works, Plaintiff's registrations for those works only claimed authorship as to the photographs in three of the articles: "Citizen tip leads to drug arrest," "MSU extension collecting unsolicited seed" and "Pillow grad enjoys job in AC repair." *See* Ex. 3, Registration Certificates 7, 15, 17. But the presumption of validity afforded to Plaintiff's registrations in the first two of those Registered Works is easily rebutted as to the photographs in those works. *First*, as to the photograph Plaintiff used with "Citizen tip leads to drug arrest," that image was a mugshot taken by the Clarksdale Police Department, *see* Ex. 4, CPD Certificate of Authenticity and [Doc. 1-1] at 48-49, such that Plaintiff cannot possibly claim to own the copyright in that image. *Second*, as to the photograph Plaintiff used with "MSU extension collecting unsolicited seed," that image was taken by the Washington State Department of Agriculture, *see* Ex. 5, Seed Photograph and [Doc. 1-1] at 57-64. Thus, it too cannot possibly be owned by Plaintiff. Accordingly, Plaintiff cannot establish ownership of valid copyrights as to "Citizen tip leads to drug arrest" and "MSU extension collecting unsolicited seed," and even if it could, it cannot show copying by Particle Media of constituent elements of the photographs that are original to *Plaintiff. See Gen. Universal Sys.*, 379 F.3d at 141.

**B.** **The Court should grant summary judgment in favor of Particle Media on fair use.**

Even assuming, for the sake of argument, that Plaintiff *can* prove copyright infringement as to all aspects of the Registered Works (it cannot), it is Particle Media, and not Plaintiff, that is entitled to summary judgment on the issue of Particle Media's fair use defense.

"[A]nyone who ... makes a fair use of [a] work is not an infringer of the copyright with respect to such use." *Sony Corp. of Am.*, 464 U.S. at 433. This is because, under Section 107 of the Copyright Act, "the fair use of a copyrighted work ... for purposes such as criticism,

comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." 17 U.S.C. § 107. "[F]air use is an affirmative defense that 'can excuse what would otherwise be an infringing use of copyrighted material.'" *Estate of Barré v. Carter*, 272 F. Supp. 3d 906, 929 (E.D. La. 2017) (quoting *Cambridge Univ. Press v. Patton*, 769 F.3d 1232, 1238 (11th Cir. 2014)).

"Because the overarching goal of copyright is to stimulate intellectual activity for the public good, courts have long recognized a 'limited privilege in those other than the owner of a copyright to use the copyrighted material in a reasonable manner without the owner's consent.'" *Bell v. Eagle Mountain Saginaw Indep. Sch. Dist.*, 27 F.4th 313, 321 (5th Cir. 2022) (citing *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994); quoting *Fisher v. Dees*, 794 F.2d 432, 435 (9th Cir. 1986)) (internal citations omitted). "This privilege applies when 'rigid application of the copyright statute' would 'stifle the very creativity' it is meant to foster." *Bell*, 27 F.4th at 321 (quoting *Stewart v. Abend*, 495 U.S. 207, 236 (1990)).

Congress codified the fair-use doctrine in the Copyright Act of 1976 and enumerated four factors courts should consider when applying it: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. The factors are not exclusive. *Bell*, 27 F.4th at 321 (citing *Harper & Row Pub., Inc. v. Nation Enters.*, 471 U.S. 539, 560 (1985)). "All are to be explored, and the results weighed together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 578. "A fair-use defense can succeed even if one or more

factors favor the claimant." *Bell*, 27 F.4th at 321 (citing *Campbell*, 510 U.S. at 578; *Compaq Comput. Corp. v. Ergonome Inc.*, 387 F.3d 403, 409-10 (5th Cir. 2004)).

Fair use is a mixed question of law and fact that requires a case-by-case determination as to whether a particular use of a copyrighted work is a fair use. *Campbell*, 510 U.S. at 577; *Harper & Row*, 471 U.S. at 560. But courts have recognized fair use may be resolved on summary judgment. *See*, *e.g.*, *Castle Rock Entm't v. Carol Publ'g. Grp., Inc.*, 955 F.Supp. 260, 267 (S.D.N.Y. 1997), *aff'd Castle Rock Entm't, Inc. v. Carol Publ'g.Grp., Inc.*, 150 F.3d 132 (2d Cir. 1998). And for the reasons discussed below, the Court should grant summary judgment in favor of Particle Media.

1. **The first factor favors fair use because Particle Media's use of Plaintiff's works was transformative, as it served a new purpose and provided a public benefit.**

    i. **Particle Media's use of the Registered Works was transformative.**

The Supreme Court has explained the central purpose of the first factor is to determine "whether the new work merely 'supersede[s] the objects' of the original creation, or instead adds something new, with a further **purpose** or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is 'transformative[.]'" *Campbell*, 510 U.S. at 579 (internal quotations omitted). Because the goal of copyright is generally furthered by the creation of transformative works, such uses "lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright … and the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Id*.

Plaintiff argues Particle Media was not transformative because it did not alter Plaintiff's headlines, photos, or content. *See* [Doc. 68] at 11. First, to clarify, Mr. Zhong accurately testified that Particle Media's parser does not alter the image in any way when it extracts the image from

the website. *See* Ex. 6, Particle Media 30(b)(6) (R.Z.) at 20:23-21:3. Nevertheless, that fact alone

is not dispositive, as Particle Media *does* alter the image by reducing the file size when it is

saved and posted. *See* Ex. 1, Mazzola Decl. at ¶9.  Moreover, as courts have recognized, even

"exact copies of copyrighted work can be transformative in certain contexts." *Am. Inst. of*

*Physics v. Winstead PC*, 2013 WL 6242843, at \*6 (N.D. Tex. Dec. 3, 2013) (citing *A .V. ex rel.*

*Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 638 (4th Cir. 2009) (holding a use can be

transformative in function or purpose without altering or actually adding to the original work);

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007) (holding that use of

unaltered images in a search index was "highly transformative" because the copied images

served the new purpose of creating an electronic reference tool, which provided a public

benefit)). *See also White v. West Pub. Corp.*, 2014 WL 3385480, at \*2 (S.D.N.Y. July 11, 2014)

(holding that where legal briefs were created for one purpose but then used by the defendants for

another – creating an interactive legal research tool – the first factor weighed in favor of fair

use).

Such is the case here. NewsBreak is a news aggregator that improves access to content

from a variety of publishers and sources and makes the links to those publishers and sources

available to readers through its search functionality and by performing news searching similar to

that offered by other aggregators such as Google News, Apple News, Yahoo! News, FlipBoard,

NewsNow, Newsvine, Fark, SmartNews, Feely and others. *See* Ex. 7, Sell Depo., at 46:5-13; Ex.

8, Sell Report at ¶¶12(c) and (e), 18, 23; Ex. 1, Mazzola Decl. at ¶6. Like these other news

aggregators, NewsBreak hosts a broad range of general news content that the general public can

search and customize to suit their own needs and preferences. Ex. 8, Sell Report at ¶23. It allows

customers to quickly discover content from a variety of news sources using a single search or

through customization of preferences and viewing options, essentially creating personalized news feeds. *Id*. at ¶19. This allows users to have personalized control over the news and information they receive. *Id.* at ¶20.

When a user launches the NewsBreak app for the first time, NewsBreak first determines the user's location and/or the user inputs one or more locations, and then NewsBreak quickly surfaces a news feed of stories relevant to such particular location(s), including stories from local publishers, national news organizations, contributors' original content, government and official sources, and the public domain. *See* Ex. 1, Mazzola Decl. at ¶6; Ex. 8, Sell Report at ¶41. The user's experience is similar to that of using Google News, Apple News or other news aggregators. *Id*. NewsBreak users can also customize their location, follow specific news providers, and choose from among over 120 categories and subcategories of topics, from "accidents" to "pets" to "religion" to "women's health." *Id*. at ¶42. And users have the option of viewing stories from a long list of trending topics and people. *Id*. at ¶43. The overall user interface excels at engaging and providing useful information to the user. *Id*. Acting as a search engine, NewsBreak searches data (such as text or a database) for specified information and, as to the content of non-partner publishers, provides easy access to the source of content it has gathered from other sites across the internet based on search criteria and/or category filters set by the user. *Id*. at ¶¶96, 98, 107. Use of the text excerpts allows NewsBreak to serve as an electronic reference tool to connect users to the original source of stories corresponding to their preference-based searches. *See* Ex. 1, Mazzola Decl. at ¶4. As for the thumbnail image used with "Pillow grad enjoys job in AC repair," it too was transformative for the same reasons. *See Perfect 10*, 508 F.3d at 1165 (finding incorporating entire image into search engine results was highly

transformative such that first factor heavily favored fair use because it served purpose of improving access to information).

As a result of the gathering process, NewsBreak drives traffic to the original publishers' websites. *See* Ex. 8, Sell Report at ¶12(d). In fact, NewsBreak is near the top in total traffic referral, along with Twitter, Google, Facebook and Google News. *Id*. at ¶57. The traffic generated by NewsBreak presents an opportunity for news outlets, particularly small publishers, by directing traffic to their websites, often allowing them to reach audiences beyond those they could reach on their own. *Id*. at ¶12(b).

Plaintiff cites *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 551 (S.D.N.Y. 2013), for the statement that a "use of copyrighted material that merely repackages or republishes the original is unlikely to be deemed fair use" and a "change of format, though useful" is not transformative. *See* [Doc. 68] at 11. But the situation presented here is distinguishable from that in *Meltwater*. There, defendant Meltwater, a subscription-based internet media monitoring service, used a computer program to scrape news articles on the web and, among other things, provide excerpts of those stories, including many AP stories, in search result reports it provided to its paying subscribers. *Meltwater*, 931 F. Supp. 2d at 543-46. Meltwater competed with other companies that paid licensing fees to AP and even competed with AP for business, marketing itself as a substitute for AP's news service. *Id*. at 543-544, 552. In analyzing whether Meltwater's use was transformative, the court described Meltwater as "an expensive subscription service that markets itself as a news clipping service, ***not as a publicly available tool to improve access to content across the Internet***." *Meltwater*, 931 F. Supp. 2d 553-54 (emphasis added). The court focused, in part, on the fact that each Meltwater search report displayed two excerpts from each article, including a 300-character snippet of the opening

text of the article and a 140-character snippet displaying the keyword for which the user searched.  *Id*. at 545. The court held there was nothing transformative about Meltwater's news clipping service. *Id*. at 556.

However, the *Meltwater* court also stated that "even though it could be said that a search engine merely 'repackages' the original work, and does not transform it in the sense of adding 'new expression, meaning or message,' that does not mean that its taking is ineligible for protection under the fair use defense." 931 F. Supp. 2d at 556 (internal citations omitted). A defendant's use that "is plainly different from the original purpose" for which the work was created may be transformative. *Id.* (citation omitted). The court stated that "the purpose of search engines is to allow users to sift through the deluge of data available through the Internet and to direct them to the original source. That would appear to be a transformative purpose." *Id*.

That same transformative purpose accomplished by search engines is exactly what NewsBreak does. Unlike Meltwater, NewsBreak is designed and operated to sift through the deluge of data available through the Internet and, as to the content of non-partner publishers, direct users to the complete, linked news stories hosted by the publishers. *See* Ex. 1, Mazzola Decl., at ¶10. Because Particle Media's use of Plaintiff's Registered Works on the NewsBreak news feed was transformative, the first factor weighs in favor of fair use.

Nor is that conclusion negated by the undisputed fact that ads and sponsored content appear on the NewsBreak new feed. *See* Ex. 1, Mazzola Decl. at ¶8.[5] Indeed, a use's commercial nature "is only one element" of the first factor's inquiry into the purpose and character of a use;

---

[5] Plaintiff claims Particle Media's "entire income stream" is derived "from ads placed around the content which it scrapes from websites operated by publishers like Plaintiff." [Doc. 68] at 11. While ads and sponsored content appear on the news feed, that is not Particle Media's only revenue stream, and the revenue stream generated from the news feed is not significant. *See* Ex. 1, Mazzola Decl. at ¶8; Ex. 2, Emmerich 30(b)(6) at 146:24-147:11 (acknowledging the amount paid by Google Ads is tiny). And as described in detail herein, the content on NewsBreak is broader than the content of "publishers like Plaintiff." *See* Ex. 1, Mazzola Decl. at ¶8.

it is not determinative. *Campbell*, 510 U.S. at 570, 584 (holding commerciality does not automatically count against a fair use defense, as such a presumption would "swallow nearly all of the illustrative uses" listed in § 107). *See also Triangle Publ'ns, Inc. v. Knight–Ridder Newspapers, Inc.*, 626 F.2d 1171, 1175 (5th Cir. 1980) (holding commercial character of an activity is not a dispositive bar to fair use defense). Because Particle Media's use is transformative, the significance of the commerciality inquiry is greatly decreased. *See id.* Thus, the conclusion remains that the first factor favors a finding of fair use.  *Google LLC v. Oracle America, Inc.*, 141 S. Ct. 1183, 1204 (2021) (holding Google's use was a fair use because it was transformative, even though the new work was for commercial gain).

      **ii.**  **None of the evidence or testimony on which Plaintiff relies supports its conclusion that Particle Media did not act in good faith.**

      **a.**  **Plaintiff mischaracterizes evidence and testimony regarding Particle Media's good faith.**

Plaintiff claims that due to what it calls "three critical facts," Particle Media cannot genuinely argue its practices are protected by fair use. But Plaintiff's argument is contradicted by the very same "critical facts" that it cites. In fact, none of them supports its position.

*First*, the 2020 stock purchase agreement that Plaintiff references does not show that Particle Media's use was not a fair use. On the contrary, that agreement stated: "Though, to the Company's knowledge, the jurisprudence has not definitively resolved whether news aggregation is fair use under the law, ***the Company believes that its aggregation of news media falls within fair use and anticipates no material liability pursuant to its business practice of aggregating content not under an explicit license***." *See* Ex. 1, Mazzola Decl., at ¶16 (emphasis added).

*Second*, the testimony of Robert Mazzola, one of Particle Media's 30(b)(6) witnesses. Confirmed the corporate statement. Contrary to Plaintiff's assertion that Mr. Mazzola "admitted" that Particle Media's use "may not be legal," he merely testified truthfully that he was not aware of any new cases on point with respect to news aggregation that would apply to the specific factual circumstances of how NewsBreak works. *See* Ex. 10, Particle Media 30(b)(6) (R.M.) at 90:19-92:8. Neither of these truthful statements are concessions that NewsBreak does not fall within the scope of the fair use defense. In fact, the disclosure and Mr. Mazzola actually state the opposite. *See, e.g.,* Ex. 1, Mazzola Decl., at ¶16 ("the Company believes that its aggregation of news media falls within fair use"); Ex. 10, Particle Media 30(b)(6) (R.M.) at 88 ("We believe that the use of snippets, as I've generally described it to you, would constitute fair use based on the factors and the current case law.").

*Third*, Plaintiff selectively, and misleadingly, quotes the testimony of Particle Media's industry expert, Blake Sell. Mr. Sell is an independent management consultant specializing in the media industry who has worked for The Associated Press (the "AP") and Getty Images, among other media and publishing companies. Asked about a photograph used in connection with a story on the NewsBreak news feed and whether the AP would consider it an authorized use, Mr. Sell stated: "we might have contacted that organization and ***asked them to explain their use*** or to try to – to get them to license the content or ask them to take it down." *See* Ex. 7, Sell Depo., at 62:12-64:11 (emphasis added); *see also id.* at 63:12-21 ("[W]e might contact this organization and say, 'We noticed that you're using some thumbnails, and we don't seem to have a licensing agreement with you. ***So please explain your use***.' And after our conversation with them, we might try to get them to license the content, or we might ask them to take it down or – I mean, there's any number of ways that this could be resolved.") (emphasis added).

15

Plaintiff's quotation of Mr. Sell's testimony selectively omits his statement that the AP and Getty Images might have asked the organization "to explain their use" before deciding how to handle it, a statement of particular relevance given the fact Plaintiff is trying to apply Mr. Sell's testimony to disprove fair use. *See* [Doc. 68] at 3 (using ellipses in place of that language). Plaintiff further mischaracterizes Mr. Sell's testimony by claiming that he said Particle Media's use of photographs would not be considered legal by his prior employers – he did not – and that he will testify against Particle Media – he certainly will not. *See* [Doc. 68] at 3. To the contrary, Mr. Sell will testify, among other things, that "NewsBreak is a news aggregator that offers consumers robust search functionality and customization;" and that "[a]s experienced by users, NewsBreak is a search engine for the discovery of news information from the infinite variety of sources across the internet, in the same manner as Google News[,]" *See* Ex. 8, Sell Report, at ¶¶12(b), 107. He will also testify that far from representing impending doom, "NewsBreak and other news aggregators represent a hope of survival for small publishers like the plaintiff." *Id*. at ¶114. Thus, as discussed in greater detail in below, far from contradicting Particle Media's fair use defense, Mr. Sell's expert testimony robustly supports it. *See id.* at ¶¶41-46, 50-51, 54-64.

### b. **Plaintiff misunderstands and/or misconstrues Particle Media's business model and web crawler.**

Plaintiff's statement that Particle Media's "entire business model consists of making money off of other people's news content" is incorrect. *See* [Doc. 68] at 3. The statement ignores the actual business of NewsBreak, which not only provides news aggregation to millions of readers, including news from government and official sources and the public domain, but also creates original journalistic news content of its own through its NewsBreak Original program. *See* Ex. 1, Mazzola Decl. at ¶17; Ex. 8, Sell Report, at ¶¶41, 58. In fact, since October 2020 the NewsBreak Original program has recruited and developed almost 4,000 independent journalists,

bloggers, writers, photographers and videographers who create local content across an array of topics for inclusion into the NewsBreak feed. *See* Ex. 1, Mazzola Decl. at ¶17; Ex. 8, Sell Report, at ¶60. Their content is available along with other content from large and small publishers by scrolling or searching NewsBreak. *See* Ex. 1, Mazzola Decl. at ¶17; Ex. 8, Sell Report, at ¶60. These original contributors adhere to high editorial standards, and Particle Media has created a division dedicated to the program that is tasked with growing the number of contributors, moderating content and managing the program. *See* Ex. 1, Mazzola Decl. at ¶17; Ex. 8, Sell Report, at ¶61.

       As for Plaintiff's statements about Particle Media's web crawler, Plaintiff confuses how the web crawler works with what is ultimately displayed on NewsBreak. According to Plaintiff's designated expert Gregory Griffith, NewsBreak and similar apps usually consume third-party news content in two ways: really simple syndication ("RSS") or scraping. *See* Ex. 9, Griffith Report at 1-2. RSS formats are designed "to encode common information about the various components of a news article such as title, description, author, publish date, etc." *Id.* at 2. Many news organizations publish RSS feeds of their content. *Id.* at 3. "By reading through a publication's RSS feed, computer programs can parse the feed into items, and further parse the items into components for display on apps like NewsBreak." *Id.* at 4.

       If a website does not have an RSS feed, an aggregator and/or search engine is likely consuming its content by scraping. *See* Ex. 9, Griffith Report at 4. "In scraping, a web page's content is consumed by a computer program that issues an HTTP request for the entirety of a web page." *Id.* According to Mr. Griffith, "[t]his differs from a request from an RSS feed in the sense that an RSS feed is structured specifically to make the parsing of a site's content easy for the requesting program, whereas a requesting program making a scrape request does so with the

knowledge that the content return[ed] by the host site will need to be parsed by the requesting program in a way that typically involves a very deliberate and occasionally painstaking combination of methods to extract the content the requesting program is looking for." *Id*. The information returned by the host server is in the form of HyperText Markup Language ("HTML"), and an aggregator and/or search engine parses the HTML into its various components. *Id*. at 4-7.

Regardless of whether the content is consumed via an RSS feed or scraping, "[o]nce the parser isolates the extracted article content and deposits it in its database, the app viewer, which is the component understood by most people as 'the app,' retrieves the content from the database and displays it to the user." *See* Ex. 9, Griffith Report at 8.

Plaintiff seems to contend that there should be a distinction between how Particle Media's web crawler consumes content from the sites of publishers with whom Particle Media has agreements ("partner publishers") and those publishers with whom Particle Media does not have agreements ("non-partner publishers"). *See* [Doc. 68] at 4-5. But consistent with industry practice, Particle Media's web crawler crawls the sites of both partner and non-partner publishers in the same manner, first using RSS feeds or scraping to consume all of the content related to a particular article in order to understand the content and filter any content that does not fit the criteria of the industry's content policies,[6] and then saving the headline, image, and content of the article on its server. *See* Ex. 6, Particle Media 30(b)(6) (R.Z.) at 20-27; Ex. 1, Mazzola Decl. at ¶9.

Not surprisingly, Plaintiff's expert testified that his own company, EdgeTheory, which provides news aggregation services to its clients, consumes an average of 60,000 news items and

---

[6] This includes, for instance, policies regarding illegal or explicit content. *See* Ex. 1, Mazzola Decl. at ¶9, n, 2.

social media posts every day, has been doing it for years, and has billions of rows of data in its database. *See* Ex. 11, Griffith Depo., 13:5-18, 18:25-19:2. For those sites where an RSS feed is available, EdgeTheory consumes headlines, excerpts of the articles as provided, and various metadata. *Id*. at 14:11-21. If an RSS feed is *not* available, EdgeTheory will scrape the source, extracting the entire article for purposes of keyword analysis and then discarding content like advertising. *Id*. at 15:5-11, 21:12-22, 44:1-10. EdgeTheory does all this despite the fact it does not have agreements with *any* publishers, nor does it have express authority to consume their data. *Id*. at 16:2-17. In sum, there is nothing nefarious or out of the ordinary about how Particle Media uses its web crawler.

### c.  Particle Media's use of Emmerich's full text content was unintentional.

As stated above, there were times during which, in error, articles from Plaintiff and other non-partner publishers were inadvertently made available in full on the NewsBreak app on Android devices. *See* Ex. 1, Mazzola Decl. at ¶8. In those instances, users on Android devices were not directed from the news feed to the publishers' websites but rather viewed the full articles within the app. *Id*. To be clear: Particle Media does not contend that those unintentional uses of full text were fair use, and, thus, Plaintiff's motion is moot as to that. However, because Plaintiff misrepresents testimony in arguing the publication of its articles was willful, Particle Media must set straight the facts and evidence presented by the parties.

The error first occurred when engineers who were unfamiliar with Particle Media's policy not to show full text content of non-partner publishers were trying to address a functionality issue related to certain non-mobile-friendly content and displayed full content by mistake. *See* Ex. 6, Particle Media 30(b)(6) (R.Z.) at 31:12- 34:11. Upon learning of the error, the company took immediate action to stop it and emphasized to the product managers and

engineer managers the company policy not to show full text content from non-partner publishers. *See id.* at 34:15-24; Ex. 1, Mazzola Decl. at ¶8. Several months later, the error occurred again when another engineer tried to resolve a bug and accidentally removed the programming that disabled the ability to put out unlicensed full text content. *See* Ex. 6, Particle Media 30(b)(6) (R.Z.) at 35:1-8; Ex. 1, Mazzola Decl. at ¶8. Particle Media worked quickly to put the programming back in place. *Id.*

Plaintiff claims three "facts" show Particle Media's publications of Plaintiff's articles were willful, not a glitch: (1) Particle Media did not notify Plaintiff of the error; (2) the error did not affect any other publishers' websites; and (3) Particle Media did not identify any employees who were disciplined. [Doc. 68] at 8. Plaintiff is wrong as to all three "facts." *First*, Particle Media did not even know Plaintiff was affected by the error until it received the Complaint. *See* Ex. 1, Mazzola Decl. at ¶8. *Second*, when asked to identify all other non-partner publishers whose articles could be viewed in full text as a result of these malfunctions, Particle Media's software programmer Randy Zhong testified that it would be extremely difficult if not impossible to do so because:

> [t]he problem only occurs to end users for mobile-unfriendly websites. It is very difficult for us to find out all the list reliabl[y]. Remember, it take us a few weeks to find out such information for Emmerich, and during the process, we made several mistakes in finding the information just for Emmerich.[7] When it goes for thousands of websites in our system, the complexity grows exponentially in order to find the publishers, given the large number of websites. That's why we did not find out those … publishers.

*See* Ex. 6, Particle Media 30(b)(6) (R.Z.) at 35:10-36:2. *See also* Ex. 10, Particle Media 30(b)(6) (R.M.) at 55:24-56:11 ("I know that Emmerich would not have been the only party affected by this error, but I'm not aware specifically of those names."). In other words, other publishers'

---

[7] Mr. Zhong was referring to post-litigation efforts determine use information relevant to Plaintiff's websites. *See* Ex. 1, Mazzola Decl. at ¶14, n. 4.

websites were affected by the error, but they have not been specifically identified due to the significant difficulty involved in identifying them. *See id*.

*Finally*, while no employees were disciplined as a result of the errors, after those mistakes occurred, Particle Media reiterated the company policy against use of full text of non-partner publishers to the product managers and engineer managers, and the engineer who was responsible for removing the programing that disabled the unlicensed full text content is no longer with the company. *See* Ex. 1, Mazzola Decl. at ¶8; Ex. 6, Particle Media 30(b)(6) (R.Z.) at 34:15-24. The fact remains that Particle Media's use of Emmerich's full text content was the result of mistakes made by engineers, and was not intentional, and Plaintiff has not identified any evidence to the contrary.

**2.  The nature of the copyrighted works favors fair use because the Registered Works are factual in nature.**

The second statutory factor is "the nature of the copyrighted work." 17 U.S.C. § 107(2). This factor "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586. "In general, fair use is more likely to be found in factual works than in fictional works." *Bell*, 27 F.4th at 323 (quoting *Abend*, 495 U.S. at 237). "To determine the nature of the work, [courts] consider whether the work has been appropriated for its 'expressive elements,' rather than to disseminate 'the underlying facts.'" *Bell*, 27 F.4th at 323 (quoting *Harper & Row*, 471 U.S. at 563-64).

Plaintiff argues Particle Media scraped articles including both hard news and editorial content, which it claims is "more like fiction than hard news." *See* [Doc. 68] at 12. But there can be no dispute that the Registered Works do not include editorial content. Rather, they are entirely

factual in nature, as they constitute typical news articles that were used to disseminate the underlying facts.[8]

Plaintiff also claims, wrongly, that "[v]irtually the exact same fact situation existed in *Meltwater*, where the Court concluded definitively that fair use did not apply." *See* [Doc. 68] at 12. However, even if this were the exact same fact situation as existed in *Meltwater* – which, as described above, it is not – as to the second factor, the *Meltwater* court stated: "[the] AP's articles are news stories and therefore more vulnerable to application of the fair use defense than works of fiction. Moreover, Meltwater copied works that were already published. As a consequence, this factor 'is at most neutral on the question of fair use,' … ***and should be weighed in favor of finding fair use***." *See Meltwater*, 931 F. Supp. 2d at 557 (emphasis added) (citations omitted). Therefore, the second factor weighs in favor of finding fair use. *Id*.

---

[8] "Carrol County School District to start August 13" is about the school district's approval of a delay to the start of school to give the school board time to decide how to handle distance learning and to give parents time to ask question and make decisions about whether their children should attend in person or virtually. *See* Ex. 1, Mazzola Decl., at Ex. A at 8. "Citizen tip leads to drug arrest" is about the arrest of a woman for felony possession of a controlled substance and other crime-stopping efforts promoted by the city. *Id*. at Ex. A at 3. "City puts new water billing system to use" is about a new billing system for the City of McComb that included text and email reminders, pay through text, automatic payments and online usage reports. *Id*. at Ex. A at 6. "County will pursue more virus aid" is about the types of COVID-19 aid that may be available to Leflore County and other things being considered by the Board of Supervisors. *Id*. at Ex. A at 5. "MSU Extension collecting unsolicited seeds" is about guidance from the Mississippi Commissioner of Agriculture and Commerce regarding unsolicited seeds purportedly sent from foreign countries. *Id*. at Ex. A at 2. "Pillow grad enjoys job in AC repair" is about someone who graduated from a local high school and community college and decided after working in HVAC repair in high school that he wanted to stay in the Delta and do that long term. *Id*. at Ex. A at 9. "Some school board members waiting to make decision on fall sports vote" is about where certain board members seemed to stand on whether fall sports and activities should be shut down and what other school districts have decided. *Id*. at Ex. A at 7. "Uptown mall wants downturn in taxes" is about a tax accessor's valuation of mall property and the property owner's appeal, as well as the tax accessor's valuation of apartments and other general board of supervisors business. *Id*. at Ex. A at 1.  And "Virus hospitalizations down, but cases continue to surge" is about COVID-19 tearing through communities and schools even though the hospitalization numbers showed a mild decline. *Id*. at Ex. A at 4.

**3.  The third factor favors fair use because the quantity and quality of the material used was reasonable in relation to Particle Media's purpose.**

The third fair use factor examines "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). Courts consider "whether the amount copied is either a quantitatively or qualitatively significant part of the original." *Bell*, 27 F.4th at 324 (citing *Campbell*, 510 U.S. at 586-87). "[T]he extent of permissible copying varies with the purpose and character of the use." *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006) (citing *Campbell*, 510 U.S. at 586-87). In other words, courts consider whether the material used "was reasonable in relation to the purpose of the copying." *Pierson v. DoStuff Media, LLC*, 2019 WL 5595236, at *5 (W.D. Tex. Oct. 29, 2019) (citation and internal quotation marks omitted). *See also White*, 2014 WL 3385480, at *3 ("Although defendants here copied the entirety of [plaintiff's] brief, such copying was necessary to make the briefs comprehensively text searchable.").

Plaintiff claims the size of the snippets on the NewsBreak news feed exceeds anything that has been allowed under fair use in any other jurisdiction and Particle Media used the "heart" of the works. *See* [Doc. 68] at 12. But, as discussed below, the amount of Plaintiff's Registered Works used in each snippet was both quantitatively reasonable (using between 8% and 15% of the original) and qualitatively reasonable (omitting key elements of the original stories).

The "Carrol County School District to start August 13" snippet stated at most: "Parents and students in the Carroll County School District will have another week to prepare and decide whether they want to send their child to school face-to-face or virtually. The school board approved a proposed new calendar presented by Superintenden—." *See* Ex. 1, Mazzola Decl., at

Ex. A at 8.[9] If the snippet appeared on the NewsBreak website, it included approximately 40 words. The snippet that appeared on the app included approximately 20 words, and the full article included 343 words. *Id.* Key details from the article were not in the snippet, including but not limited to: the timeline of key dates; steps to be taken by the schools, the school board, and parents; how virtual learning will work each day; and how absences are going to be counted. *Id.*

The "Citizen tip leads to drug arrest" snippet stated at most: "A tip phoned into Clarksdale Police has prompted the arrest of a woman on illegal drug charges and authorities are continuing to urge you to help them clean up Clarksdale. Police reports indicate Maruerite Carter, 38, was arrested after a concerned citiz—." *Id.* at Ex. A at 3. The snippet included approximately 42 words, and the full article included 271 words. *Id.* Key details were not in the snippet, including but not limited to: the precise charge against the woman who was arrested; what the concerned citizen reported; the status of the woman's case; and the entire second half of the article regarding taking steps to prevent car burglaries and report suspicious activity. *Id.*

The "City puts new water billing system to use" snippet stated at most: "McComb officials hope a new water bill system that city officials say will drastically improve services with multiple new functions. The system came at no cost to the city, and only required the approval of the city board to enter the new contract. The ne—" *Id.* at Ex. A at 6. The snippet included approximately 45 words, and the full article included 354 words. *Id.* Key details from the article were not in the snippet, including but not limited to: the new functions offered by the new system; additional benefits of the new system; and when it will go live. *Id.*

---

[9] The snippets were recreated based on what a user of the website would have viewed, but the snippets on the app were even shorter, as demonstrated by the exhibit to Plaintiff's Complaint which shows the snippet for this article as "Parents and students in the Carroll County School District will have another week to prepare and decide whether they want to send their child…" [Doc. 1-1] at 13. *See also* Ex. 1, Mazzola Decl., at Ex. A at ¶14. This is significant as mobile device users currently constitute more than 90% of NewsBreak's average daily users. *See* Ex. 1, Mazzola Decl., at ¶10; Ex. 8, Sell Report at ¶56.

The "County will pursue more virus aid" snippet stated at most: "The Leflore County Board of Supervisors discussed applying for more funding from the Coronavirus Aid, Relief, and Economic Security (CARES) Act as well as from the Federal Emergency Management Agency. Fred Randle, director of the Greenwood-Leflore Emergen—." *Id*. at Ex. A at 5. The snippet included approximately 37 words, and the full article included 297 words. *Id.* Key details from the article were not in the snippet, including but not limited to: the information brought to the board by the director; the deadlines to apply for aid; the expenses reimbursable through the CARES Act and FEMA; other technology that may be purchased; the next steps for funding; and the board's vote regarding employee health insurance. *Id*.

The "MSU Extension collecting unsolicited seeds" snippet stated at most: "Mississippi Commissioner of Agriculture and Commerce Andy Gipson announced that residents receiving unsolicited packages of seeds with addresses alleging they are from China, or any foreign country, can now drop off the seeds at the Mississippi State Univ—." *Id*. at Ex. A at 2. The snippet included approximately 38 words, and the full article included 350 words. *Id.* Key details from the article were not in the snippet, including but not limited to: first and foremost, where people could drop off seeds; the number of reports of unsolicited seeds; the fact that the Commissioner wanted the public to hold on to the mailing label and place the seeds and packaging in a plastic bag prior to drop off; the fact that investigators are looking into whether the seeds could be a hoax with a political angle; and that recipients should not plant the seeds. *Id*.

The "Pillow grad enjoys job in AC repair" snippet stated at most: "Dylan Foster says once you have lived in the Delta, you don't ever want to leave. 'You're going to want to spend your entire life here,' said the 23-year-old Greenwood resident. Foster, who graduated from Pillow Academy in 2016 and Mississippi Delta Commu—." *Id*. at Ex. A at ¶9. The snippet

included approximately 43 words, and the full article included 430 words. *Id.* Key details from the article were not in the snippet, including, but not limited to: Foster's job experience and where he works now; his personal life; and his involvement in the community. *Id.* As to the thumbnail used on the news feed, this factor "weighs less when considering a photograph— where all or most of the work often must be used in order to preserve any meaning at all—than a work such as a text or musical composition, where bits and pieces can be excerpted without losing all value." *Katz v. Google Inc.*, 802 F.3d 1178, 1183-84 (11th Cir. 2015) (quotations and citations omitted). It is neutral or supports fair use. *See id.* (finding that the nature of a photo is neutral or supports fair use and that it is necessary to use all of a photo given the nature of the work, as photos cannot be summarized or excerpted). Further, the image could not be saved on NewsBreak by clicking on the photo or holding it down. *See* Ex. 1, Mazzola Decl. at ¶11.

The "Some school board members waiting to make decision on fall sports vote" snippet stated at most: "The Greenwood Leflore Consolidated School District's top brass thinks it's best for the safety of all to shut down fall sports and activities for its three high schools. On Tuesday, concerned parents, teachers, coaches and players will find out what the s—." *Id.* at Ex. A at ¶9. The snippet included approximately 42 words, and the full article included 372 words. *Id.* Key details from the article were not in the snippet, including, but not limited to: what school board members have said about fall sports and activities; what the superintendent said about the issue during a work session the previous week; and what other schools have decided. *Id.*

The "Uptown mall wants downturn in taxes" snippet stated at most: "Edgewood Mall, soon to be known as Uptown McComb, appealed its county tax rates to Pike County supervisors on Monday. Mall representative William Ward claimed the property has a $7.5 million value, half of what's on the county tax roll. He said the proper—." *Id.* at Ex. A at ¶7. The snippet

included approximately 44 words, and the full article included 499 words. *Id.* Key details from were not in the snippet, including, but not limited to: the history of the property's tax assessments; how the most recent purchaser plans to lease the space; the tax assessment of a local apartment complex; and other items of business considered by the board of supervisors. *Id.*

And, finally, the "Virus hospitalizations down, but cases continue to surge" snippet stated at most: "Hospitalizations due to COVID-19 are down across the state, health officials identified fewer cases Monday than in recent days and The Claiborne was removed from a state list of long-term care facilities with ongoing coronavirus outbreaks. Despite the mod—." *Id*. at Ex. A at 4. The snippet included approximately 39 words, and the full article included 482 words. *Id.* Key details from the article were not in the snippet, including, but not limited to: the fact that the modest suppression in hospitalizations was good, but that COVID-19 was tearing through the community; details regarding the areas of surges; and descriptions of school outbreaks and scheduling decisions being made by schools. *Id.*

In sum, a fair reading of the full articles shows that the snippets Particle Media used were not the "heart" of the articles or "the part most likely to be newsworthy," and that use of the snippets would not "fulfill[ ] demand for the original." *See Campbell*, 510 U.S. at 590 (quoting 3 M. NIMMER, NIMMER ON COPYRIGHT § 13.05[A][4], p. 13-102.61 (1993)). No publisher would include the heart of the article or the part that would be most newsworthy in the first 50 words of the articles, because the reader would have no reason to continue reading. Moreover, Plaintiff's argument that a reader has no need to click on the link to read an article once he has seen the headline, a picture, and the first few words of the story is disingenuous, because it is contradicted by Plaintiff's own use of Facebook to promote its stories, routinely posting the first couple of sentences in the hope that users will be enticed to click on the link, and by Plaintiff's

use of snippets to try to get people to click and subscribe to see what is behind its paywall. *See, e.g.,* Ex. 12, Facebook Example; Ex. 8, Sell Report at ¶92 and Ex. G. Plaintiff's own expert, Mr. Griffith, acknowledged that "displaying a brief excerpt falls under fair use." *See* Ex. 11, Griffith Depo. at 54:4-8, 57:2-6.

As noted above, in *Meltwater*, the court focused on the fact that Meltwater displayed two excerpts from each article, including a 300-character snippet of the opening text of the article or lede and a 140-character snippet displaying the keyword that the user searched for. 931 F. Supp. 2d at 545. In particular, the court found this fact distinguished Meltwater from "search engines," which display "no more than a headline and a snippet of context designed to direct users to the original source." *Id*. at 558-59. The size and manner of the excerpts used by Meltwater are just two of many things that distinguish NewsBreak from Meltwater. *Id*. at 553-54. Instead, NewsBreak fits *Meltwater*'s characterization of search engines.

Because the quantity and quality of the material used on the news feed was reasonable in relation to Particle Media's purpose, the third factor weighs in favor of fair use.

4. **The fourth factor favors fair use because the NewsBreak news feed did not usurp or substitute the market of the original works but rather directed users to Plaintiff's websites.**

The fourth factor examines "the effect of the use" on the market for and value of the copyrighted work. 17 U.S.C. § 107(4). In evaluating this factor, courts consider "actual market harm but, more broadly, whether widespread use of the work in the same infringing fashion 'would result in a substantially adverse impact on the potential market' for the original work and any derivatives." *Bell*, 27 F.4th at 324 (citing *Campbell*, 510 U.S. at 590; *Compaq*, 387 F.3d at 410).

When, as here, a defendant's use of the original work was transformative, "market substitution is at least less certain, and market harm may not be so readily inferred." *Campbell*, 510 U.S. at 591; *see also Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1274 n. 28 (11th Cir. 2001) ("Whereas a work that merely supplants or supersedes another is likely to cause a substantially adverse impact on the potential market of the original, a transformative work is less likely to do so.") (quotations omitted); *Davis v. The Gap, Inc.*, 246 F.3d 152, 175 (2d Cir. 2001) (market effect must be evaluated in light of whether secondary use is transformative).

As discussed in detail above, the snippets did not reproduce such a substantial portion of the Registered Works "as to make available a significantly competing substitute" for the original work. *Bell*, 27 F.4th at 324 (quoting *Author's Guild v. Google, Inc.*, 804 F.3d 202, 223 (2nd Cir. 2015)). Rather, the properly attributed use of a short portion from each article offered the opportunity to bolster interest in the original work by serving as a preview of the entire article. *See Bell*, 27 F.4th at 324 (quoting *Narell v. Freeman*, 872 F.2d 907, 914 (9th Cir. 1989)). The benefit to Plaintiff, who does not offer a mobile app and many of whose websites have traffic so small that it cannot even be measured by web traffic monitoring services, was that NewsBreak delivered a large number of new and existing mobile users to Plaintiff's websites. *See* Ex. 8, Sell Report at ¶¶54, 56, 113-114; Ex. 13, Referral Analytics (showing referrals to sites on which the Registered Works appeared in July and August 2020).[10]

Plaintiff argues Wyatt Emmerich testified about the damaging impact Particle Media's practices have allegedly had on Plaintiff's revenue, but in reality, Mr. Emmerich's testimony was vague and unsupported. For instance, Plaintiff points to testimony by Mr. Emmerich claiming

---

[10] Plaintiff seems to contend that NewsBreak did not actually send readers who "clicked through" to Plaintiff's website, *see* [Doc. 68] at 9, but Plaintiff's own analytics show that it did. *See* Ex. 13, Referral Analytics. *See also* Ex. 6, Particle Media 30(b)(6) (R.Z.) at 29:20-30:18.

there have been "innumerable conversations between [Plaintiff's] ad reps and advertisers about why they won't buy an ad because they have cheaper alternatives through the ad networks" like GoogleAds that sell ads on NewsBreak. *See* [Doc. 68] at 13 (citing Ex. 2, Emmerich 30(b)(6), at 152). But Mr. Emmerich could not name even one advertiser Plaintiff lost because of NewsBreak. *See* Ex. 2, Emmerich 30(b)(6) at 150:2-152:14. Plaintiff also claims Mr. Emmerich testified that its publications experienced a steady decline in operating revenue over the period of time Particle Media used its content, and that since Particle Media stopped using its content, Plaintiff's revenue stabilized. *See* [Doc. 68] at 13 (citing Ex. 2, Emmerich 30(b)(6), at 178-79, 184). However, the revenue data produced by Plaintiff shows that its overall growth went down 3.1 percent in 2016, 7.8 percent in 2017, and 10 percent in 2018 – all *before* Particle Media began using Plaintiff's content. *See, e.g.,* Ex. 2, Emmerich 30(b)(6) at 181:3-184:23. And Mr. Emmerich admitted Plaintiff's drop in revenue in 2020 "was when COVID came on the scene so … presumably that would have a big effect there." *Id*. at 184:3-7. Moreover, as to Plaintiff's argument that its revenue stabilized after Particle Media stopped using its content, Mr. Emmerich admitted that that was just "one of many factors." *Id*. at 185:5-16.

There can be no dispute that the newspaper industry has been shrinking for decades. *See* Ex. 8, Sell Report at ¶12(a). According to Particle Media's media expert Blake Sell, "the arrival of the internet and digital media has created a fundamental shift in the way people interact with information and discover and consume news that long predates NewsBreak." *Id*. at ¶110. Given the reality of these changes, "[h]aving traffic delivered to its websites from NewsBreak or other news aggregators is a potential remedy for at least some of the challenges confronting the news industry today," and "presents the plaintiff with an opportunity to multiply its advertising-supported content by multiples of its own organic traffic." *Id*. at ¶113. In Mr. Sell's expert

opinion, far from representing impending doom, "Newsbreak and other news aggregators represent a hope of survival for small publishers like the plaintiff." *Id*. at ¶114. *See also id.* at ¶12(a), (b) and (d).

In sum, the NewsBreak news feed did not usurp or substitute for the market of the Registered Works, and there was no "substantially adverse impact" on a legitimate market for the works. In fact, the evidence shows that NewsBreak directed new users to Plaintiff's websites. *See* Ex. 13, Referral Analytics. The fourth factor thus weighs in favor of fair use.

## <u>CONCLUSION</u>

The statutory factors show that Particle Media's use of portions of the Registered Works on the NewsBreak news feeds was fair use. This conclusion comports with the "ultimate test of fair use": whether copyright law's goal of promoting creativity would be better served by allowing the use, rather than preventing it. *Bell*, 27 F.4th at 325 (citation omitted). Particle Media's transformative use of the Registered Works has provided a significant benefit to the public and to publishers. For the foregoing reasons, Particle Media, not Plaintiff, is entitled to summary judgment on its fair use defense stemming from alleged copyright infringement related to the NewsBreak news feed. Particle Media requests such other relief the Court deems just and proper.

Respectfully submitted, this the 17th day of May, 2022.

Respectfully submitted,

**PARTICLE MEDIA, INC.**

By:     s/ *Stephen J. Carmody*
One of its Attorneys

OF COUNSEL:
Stephen J. Carmody, MSB #8345
Karen E. Howell, MSB #102243
BRUNINI, GRANTHAM, GROWER & HEWES, PLLC
Post Office Drawer 119
Jackson, Mississippi 39205
Telephone:      (601) 948-3101
Facsimile:      (601) 960-6902
scarmody@brunini.com
khowell@brunini.com


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have electronically filed the foregoing with the Clerk of this Court using the ECF system, which sent notification of such filing to all registered users.

Dated: May 17, 2022.

_s/ Stephen J. Carmody_____

Stephen J. Carmody