IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| EMMERICH NEWSPAPERS, INCORPORATED | PLAINTIFF |
| VS. | CIVIL ACTION NO. 3:21CV32 KHJ MTP |
| PARTICLE MEDIA, INC. D/B/A NEWS BREAK and JOHN DOES 1-10 | DEFENDANTS |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF RESPONSE TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF FAIR USE**

COMES NOW Plaintiff Emmerich Newspapers, Incorporated ("Emmerich"), by and through counsel of record, and files its Memorandum in Support of its Response to Defendant's Motion for Partial Summary Judgment on the issue of fair use.

As a threshold matter, Particle does not contend that its publication of Emmerich's full-text articles was protected by fair use. Particle only contends that it is entitled to summary judgment on its fair use defense "related to the NewsBreak news feed." See [Doc. 65] at 2-3. A trial is therefore inevitable on the matter of liability and damages for its publication of full-text articles.

**THE FOUR-FACTOR ANALYSIS**

Particle does not dispute that Emmerich possessed statutorily compliant copyrights in nine of the 15 articles cited in the Second Amended Complaint. Although it argues that certain portions of two articles may not be copyrightable (for example, a stock photo which appeared in a copyrighted article which also included a headline and the lede) this does not mean the copyright was not effective for purposes of the headline and lede in those articles. Particle has not sought summary judgment on that question of law and cites no authority for that proposition because there is none.

**A.     Particle's republication of Emmerich's works on the NewsBreak news feed was done for commercial purposes and was not transformative.**

The first prong of the fair use analysis considers "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes."

Particle does not dispute that it republished Emmerich's stolen content on its news feed for commercial purposes. "Ads and sponsored content appear on Newsbreak <u>on the news feed</u> and in relation to full articles." (emphasis added) *See* [Doc. 66] at 3. Instead, it argues that it somehow "transformed" the articles, despite the fact the headlines, photos and lede were all copied verbatim and without alteration. *See* [Doc. 66] at 8.

Particle cloaks itself in the mantle of a "news aggregator," as if this somehow automatically entitles it to invoke the defense of fair use. This argument fails for at least two reasons. First, Particle goes far beyond what is done by any other news aggregator it identifies in its Motion for Partial Summary Judgment. *None* of the other aggregators cited by Particle scrape and re-publish (a) the photograph, (b) the headline, verbatim, and (c) the first 20% of the article, verbatim. This goes far beyond the boundaries which have been respected by every other news aggregator. And second, even if Particle is deemed to be a news aggregator, this still does not entitle it to invoke the affirmative defense of fair use.

Particle relies on the testimony and report of its expert witness, Mr. Blake Sell, to support its claim to be a "news aggregator." Mr. Sell testified that News Break that "brings to the surface content from a variety of publishers" and makes the links to those publishers available to readers, in the same manner as "Google News, Apple News, Yahoo! News, FlipBoard, NewsNow, Newsvine, Fark, SmartNews, Feely and others." However, when challenged on the comparison Mr. Sell acknowledged, "I have not examined these in detail . . . . To say, 'Do they ever have full-text articles?' I can't answer that." *See* Sell Depo. at 48. When asked if the other news aggregators he listed copied verbatim the headline and first 50 words of an article like Particle does, he confessed

he "could not answer if they are verbatim or not." Id. at 52: 6-10. As a result, Particle has utterly failed to establish that it is a news aggregator like "Google News, Apple News, etc."

Even more important, Particle's claim to be a news aggregator begs the question. There is not one reported decision holding that a news aggregator operating like Particle is protected by fair use, while a recent decision upheld by the Ninth Circuit Court of Appeals expressly held that an aggregator operating like Particle was *not* protected by fair use. (*Midlevelu, Inc. v. ACI Info. Grp.*, 989 F.3d 1205 (11th Cir. 2021)). In that case, a blog operator ("Midlevelu") sued a content aggregator for copyright infringement after the aggregator copied and published the blog's content. *Id.* at. 1211.

MidlevelU operated a website providing resources for midlevel healthcare providers, such as nurse practitioners and physician assistants and generated revenue through various educational programs. It also published a free blog designed to attract potential customers to its revenue-generating resources. *Id*. at 1212.

The defendant, Newstex d/b/a ACI Information Group, was a wholesale aggregator of news publications. It primarily sold collections of licensed news content to companies. Going far beyond anything Particle claims it did to "transform" the material it took from other sites, Newstex created a curated index of abstracts and full-text articles of academic blogs:

> To create the Index, Newstex compiled a repository of bibliographic information for thousands of blogs. It copied into the repository full-text content from sources its news-aggregation business had licensed. It also subscribed to RSS feeds for thousands of blogs for which it did not have a license agreement to use full-text content. Through the RSS feeds, Newstex received new articles posted to the blogs. It ran the articles through software that generated summaries of the articles. The entries in the Index for these blog articles included bibliographic information about the author and the blog, the computer-generated summary of the article, and a link to the original post. Newstex also added a tab labeled "original" to each entry, available only to subscribers. It embedded an "iFrame" in that tab so that clicking on the tab opened a window showing the original, fully browsable web page, including the full-text content of each article—a "live snapshot"—within the Index website.

Id. at 1212.   Again, Particle did nothing that comes remotely close to this in terms of "transforming" the content it stole from Emmerich.

3

The Defendant moved for summary judgment on the issue of fair use, and the lower court held this was a jury question. On appeal, Newtex insisted that its actions were protected by fair use. Like Particle, Newstex argued that the Index constituted a transformative use because it was a search engine. Id. at 1221.  The Eleventh Circuit rejected this argument out of hand:

> Whether or not the Index was a search engine, that label "is not a talismanic term that serves as an on-off switch as to fair use." *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 742 (9th Cir. 2019). Instead of "resorting to labels," we consider "the reality of what is happening." *Id*. at 740. The Index had some features of a search engine, in that it "enable[d] information retrieval by helping users find information through the use of keyword queries." Id. at 742. But making copyrighted material searchable does not alone change the original purpose of the material. Id.
>
> The jury could have reasonably found that the Index was not a transformative use based on the Index's inclusion of iFrames showing the full-text content of MidlevelU's articles. A reasonable juror could have found that the iFrames obviated any need for an Index subscriber to visit MidlevelU's website directly, so the Index superseded the use of the originals.

Id. at 1221-22.   Similarly, a jury could reasonably find that the availability of Emmerich's headlines, photos and ledes on the NewsBreak news feed "obviated any need" for the reader to visit Emmerich's websites directly, so the news feed "superseded the use of the originals."

The Eleventh Circuit also noted that "the commercial purpose of the Index also provided evidence for the jury to find that this factor did not weigh in Newstex's favor," *citing Harper & Row, Publishers, Inc. v. Nation Enters.* , 471 U.S. 539, 562, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985)." Id. at 1122.   The same analysis applies here.   The clear commercial nature of the NewsBreak news feed - saturated with ads placed by Particle, and not Emmerich, clearly demonstrates that the entire purpose of the news feed is to generate revenue for Particle, and not to "transform" Emmerich's articles into something new and different.

At any rate, Particle's claim to be a search engine is manifestly absurd.  At best, Particle includes a twig of search capability buried within a forest of stolen news content.  Unlike real search engines which scour the entire web, Particle only searches within the confines of its own database of stolen content:

4

> Q. Randy, please explain how the search function works on the News Break app.
> (Question translated.)
> A. If you type anything in the search box, we will use the key word the user type and search in the database. For those that match the typed in key word, we will show a list of articles.
> Q. And -- but the search is restricted to Particle's database; is that correct?
> (Question translated.)
> A. Yes.

[Zhong Depo. pp. 30-31].

Particle cites *Triangle Publications, Inc. v. Knight-Ridder Newspapers, Inc*., 626 F.2d 1171 (5th Cir. 1980) for the proposition that "the commercial character of an activity is not a dispositive bar to the fair use defense," and that "even exact copies of copyrighted work can be transformative in certain contexts." See [Doc. 66] at 8-9. In that case, Knight-Ridder (publisher of the Miami Herald newspaper) began publishing a listing of television shows which competed directly with T.V. Guide, published by Triangle Publications. In a series of print and television ads, Knight-Ridder juxtaposed its product with the cover of back issues of T.V. Guide for the express purposes of comparing and contrasting the two products. 626 F.2d at 1172-73. The district court held that any display of T.V. Guide back issues was done by Knight-Ridder for commercial purposes and therefore not protected by the doctrine of fair use. Id. at 1173. The Fifth Circuit concluded this was an incorrect application of the first fair use factor, noting that:

> [T]he precise characteristics of the commercial use in this case caution against too much weight being given to the fact that the use is commercial. Specifically, there was no attempt to palm off Triangle's product as that of the Herald's. (citation omitted). Rather, the advertisement was a comparative advertisement done in a manner which is generally accepted in the advertising industry.

Id. at 1176. It is absurd to suggest this scenario is in any way similar to the one in the present case. Knight-Ridder was expressly asking its readers to compare two products *and choose theirs* - which it claimed was different from, and better than, T.V. Guide. The Court noted that "Knight-Ridder did not copy what is the essence of TV Guide -- the television schedules and articles. It simply reproduced covers of old TV Guide issues." Id. at 1177. In our situation, Particle expressly and

brazenly republishes the verbatim content (headline, photo, lede) which it steals from other online publishers, surrounded by its own ads and paid content. It made no attempt to compare or contrast itself with Emmerich.

Particle's reliance on *Am. Inst. of Physics v. Winstead PC,* 2013 WL 6242843 (N.D. Tex. 2013) is similarly misplaced. In that case a publisher of scientific journals sued a law firm engaged in filing patent applications. As part of the patent applications the law firm was required to identify any possible pre-existing "prior art" which might be material to the issue of patentability. Id.at 4. By definition, this included a mandatory review and listing of other patents and publications, including non-patent literature ("NPL") of the sort published by the plaintiff. Id. at 1-2. In analyzing the first prong of the fair use defense, the Texas District Court noted that,

> Defendants' copying of NPL does not "supersede" the use of Plaintiffs' original works, but has the different purpose of providing a background context for patent examiners in their analysis of patent applications. (citation omitted). The USPTO encourages—and sometimes requires—firms to analyze and submit NPL in order to establish a background against which a final determination on a pending patent can be made. Defendants analyze the articles to determine if they are relevant to the invention they seek to patent for their client. In this sense, Defendants read the articles not to learn the scientific material contained therein, but to identify whether the article discusses scientific information related to the client's potential patent. Because the USPTO requires applicants to submit all prior art, including publications, it is not merely the content of the NPL article that matters, but its existence in the available literature.

Id. at 10. With regard to "transformation," the Court noted that,

> Copies made for such eventual submission to the USPTO are transformative, to establish the state of the industry at a particular point in time. Copies of materials submitted to the USPTO, which may include NPL as attachments, are part of a quasi-judicial process, and the use of the NPL is transformative as evidence supporting a quasi-judicial decision.

Id. On that basis, the Court concluded that the copies submitted by attorneys to the Patent Office were thus "transformative within the meaning of the first prong of § 107(1), despite the fact that they are exact copies." Id. at 11. "Defendants' copying of NPL does not 'supersede' the use of Plaintiffs' original works, but has the different purpose of providing a background context for patent examiners in their analysis of patent applications." Id. at 10. Furthermore, the Court found

that the law firm's copying of the NPL was not a "commercial enterprise" since "the Defendants realize no profit on the photocopies." Id. at 13.

To suggest this is somehow similar to what Particle does is nonsense on stilts. Particle didn't copy Emmerich's articles because it was required to do so as part of an official submission to a governmental agency -- it copied Emmerich's articles because it planned to make money selling ads around Emmerich's content without paying the customary price for the content ("'The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Harper & Row*, 471 U.S. at 562, 105 S.Ct. 2218)   It's like comparing a doctor who uses a scalpel to perform surgery with a  mugger who uses a knife to stab an innocent victim.

Particle also cites *A.V. ex rel. Vanderhye v. Iparadigms, LLC*, 562 F.3d 630 (4th Cir. 2009). The Defendant in that case was a company which archived student papers for the purpose of determining whether *other* students committed plagiarism.  Schools subscribing to the service required students to submit their papers through Iparadigms' portal (dubbed "Turnitin") "'so that the work becomes part of the database used by Turnitin to evaluate the originality of other student's works in the future." Id. at 634.  "No one at iParadigms read or reviewed the papers submitted by plaintiffs, and iParadigms did not send any paper at issue in this action . . . to anybody other than the instructor to whom plaintiffs submitted their own papers." Id. at 635. Four students whose papers were archived by Iparadigm sued, alleging copyright infringement.

The Fourth Circuit upheld the district court finding that Iparadigm's use of the archived papers was transformative, and thus protected by fair use. "The district court, in our view, correctly determined that the archiving of plaintiffs' papers was transformative and favored a finding of fair use. . . . IParadigms' use of these works was <u>completely unrelated to expressive content</u> and was instead aimed at detecting and discouraging plagiarism." (emphasis added) Id. at 639-40.

Again, the distinction between this case and *VanderHye* could not be more clear. Particle's use of Emmerich's articles was entirely "related to its expressive content" - there was no purpose

served by republishing Emmerich's headlines, photos and ledes other than to convey the information contained in the articles to readers who might be interested.

Finally, Particle relies on *Perfect 10, Inc. v. Amazon.Com, Inc.,* 508 F.3d 1146 (9th Cir. 2007). Perfect 10, Inc. publishes copyrighted photos of nude models, which Google's search engine then displays in a thumbnail version in response to search entries. Id. at 1154. "The thumbnail images are reduced, lower-resolution versions of full-sized images stored on third-party computers." Id. at 1155. "[T]humbnails [are] not a substitute for the full-sized images..." Id. at 1168.

As a threshold matter, the NewsBreak news feed is <u>not</u> a search engine like Google Search. NewsBreak does not sit idle until a user enters search terms of interest. Instead, NewsBreak continually scours targeted sites and purloins content from publishers like Emmerich, and then actively pushes that stolen content to users on its news feed. And while NewsBreak does include a modest "search" feature on its app, it does not return results from across the internet, but only from data which Particle has stored on its own database. See Zhong Depo. at ___. This is a far cry from Google Search.

The Ninth Circuit noted that "a 'transformative work' is one that alters the original work "with new expression, meaning, or message.'" *Id*. at 1164-65, *citing Campbell*, 510 U.S. at 579, 114 S.Ct. 1164. "A use is considered transformative only where a defendant changes a plaintiff's copyrighted work or uses the plaintiff's copyrighted work in a different context such that the plaintiff's work is transformed into a new creation." *Id*. "Making an exact copy of a work may be transformative "so long as the copy serves a different function than the original work ..." Id. at 1165.

Having said that, the Court noted, "duplicating a church's religious book for use by a different church was not transformative. *See Worldwide Church of God v. Phila. Church of God, Inc.,* 227 F.3d 1110, 1117 (9th Cir.2000). Nor was a broadcaster's simple retransmission of a radio broadcast over telephone lines transformative, where the original radio shows were given no "new

8

expression, meaning, or message." *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir.1998)." Id.

The facts in this case are clearly more like those in *Worldwide Church of God* and *Infinity Broad. Corp*. Emmerich's headlines, photos and ledes were not given "new expression, meaning or message" by simply being copied verbatim and republished on the Newsbreak's news feed. They were simply superseded by the republication and, as a result, potential Emmerich readers never went to Emmerich's websites.

Equally important, Particle does *not* display a thumbnail copy (i.e., "reduced, lower-resolution versions") of the images taken from the target website. Even a casual examination and comparison of the images displayed at the target websites and the images displayed on the news feed shows there is no reduction in resolution or quality at all.

And even if the images were reduced in quality and resolution to qualify as "thumbnails," Particle own expert testified that, based on his expertise in the field, "If we saw a lot of these thumbnails, we might have contacted that organization and asked them to explain their use or try to – to get them to license the content or ask them to take it down." Dep. of B. Sell at 64: 7-11. The images don't "serve a different function by improving access to information on the internet" -- they simply supersede and replace in the exact same format the images as they originally appear on Emmerich's websites. In *Perfect Ten* the Ninth Circuit noted that ""the superseding use in this case is not significant ..." Id. at. 1166. This is clearly not true in our case. Contrary to Particle's claim that it drives traffic to other publishers' websites, Emmerich Newspapers saw a dramatic increase in traffic to its web sites *after* it filed suit against Particle and *after* Particle stopped taking and republishing Emmerich's stories on its news feed.

**B.     Because the Registered Works contain a mixture of factual works and creative writing, Particle cannot demonstrate as a matter of law that the second prong weighs in its favor.**

9

Particle baldly asserts that "there can be no dispute" that the Registered works were all entirely factual in nature," appending a footnote which purports to summarize each of the nine articles in question. However, this is a statement of pure opinion with which reasonable minds can disagree. Quoting *Midlevelu*:

> To be sure, the articles are not like a fictional film that squarely falls on the creative side of the spectrum. . . . But none of the articles is a "bare factual compilation" on the opposite side of the spectrum either. (citing *Campbell*, 510 U.S. at 586, 114 S.Ct. 1164). . . . Some are more informational; some are more creative and speak from the author's personal experience. At most, this factor is neutral. But the jury could have found that the articles were sufficiently creative to weigh against a finding of fair use. *See Cambridge Univ. Press* , 769 F.3d at 1270 ("Where [the defendant's use of the plaintiffs' academic works] contained evaluative, analytical, or subjectively descriptive material that surpasses the bare facts necessary to communicate information, or derives from the author's experiences or opinions, ... the second factor [is] neutral, or even weigh[s] against fair use [where the works were] dominated by such material.").

*Midlevelu*, 989 F.3d at ___(11th Cir. 2021). Particle has simply failed to demonstrate that this factor weighs in its favor. At best it remains a question for the jury.

**C.    The amount and substantiality of the material used in relation to the copyrighted work as a whole exceeded any amount which has previously been approved by any other court, and at a minimum creates a jury question.**

The third fair use factor considers "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." Particle went to great length to count the number of words quoted verbatim in each article, but for obvious reasons failed to do the simple math to demonstrate what proportion of each article was taken:

| *Article* | *Total Words* | *Snippet Words* | *Percent Quoted* |
|---|---|---|---|
| Carroll County School District . . . | 343 | 40 | 12% |
| Citizens Tip . . . | 271 | 42 | 15% |
| City Water System . . . | 354 | 45 | 13% |
| County Pursues Virus Aid . . . | 297 | 37 | 12% |

10

| MSU Extension Collecting Seeds | 350 | 38 | 11% |
| Pillow Grad Enjoys Job . . . | 430 | 43 | 10% |
| Some School Board Members . . . | 372 | 42 | 11% |
| Uptown Mall . . . | 499 | 44 | 9% |
| Virus Hospitalizations Down . . . | 482 | 39 | 8% |

Particle does not dispute that during the time frame in question it republished on its news feed, verbatim, Emmerich's headlines, photos and the first 20% or 50 words (whichever was less) of every article. In *Associated Press v. Meltwater US Holdings, Inc*., 931 F. Supp 2d 537 (S.D.N.Y. 2013) (discussed below), the Court noted that although the parties had not "calculated the percentage of each original AP news story that was excerpted and delivered in each of the News Reports . . . it probably ranged from as low as 4.5% to slightly over 60%." Id. at 546. As will be discussed below, the Meltwater Court granted summary judgment in favor of AP and against Meltwater's claim of fair use on the basis of these facts.

Particle then purports to identify what it describes as "key details" from each article which were not included in the snippet. It insists that "a fair reading of the full articles shows that the snippets Particle Media used were not the 'heart" of the articles or "the part most likely to be newsworthy." See [Doc. 66] at 17. Of course, these are all questions of opinion about which reasonable minds can disagree, and therefore are properly left to the jury, if not decided in favor of Emmerich as a matter of law.

Returning to the Eleventh Circuit's fair use analysis in MidlevelU, the Court noted,

> To evaluate the third factor, we ask "whether [the] defendant[ has] helped [itself] overmuch of the copyrighted work in [the] light of the purpose and character of the use." (citation omitted). In conclusory fashion, Newstex says this factor weighs in favor of fair use because it "provided users with access to summaries of MidlevelU's work, full attribution to MidlevelU, and a direct link to MidlevelU's website." Newstex omits that it also provided its subscribers access to the full-text content through the iFrames. "Copying an entire work militates against a finding of fair use." VHT , 918 F.3d at 744 (alteration adopted) (internal quotation marks omitted). And

11

> in MidlevelU's eyes, Newstex's summaries were "short-form copies" that included "a substantial portion of each article." Even disregarding the iFrames, reasonable minds can differ as to whether Newstex used more of MidlevelU's content than necessary for the purpose and character of the Index.

(emphasis added). 989 F.3d at 1223. "Reasonable minds can differ" means this is a jury question - which applies with equal force in this case.

At the outset of its discussion of this point, Particle goes to Herculean lengths to distinguish its business model from that presented in *Associated Press v. Meltwater US Holdings, Inc*., 931 F. Supp 2d 537 (S.D.N.Y. 2013). In all key respects, if fails at this effort. Like Particle, Meltwater used an automated computer program known as a "crawler" to scan the Internet for news. Most of these websites made their articles available to readers without charge. Like Particle, Meltwater's crawlers extracted and downloaded content from the news websites. *Id*. at 554. The downloaded content was then organized into a structured internal format with multiple fields, and then the content was placed in a queue for indexing. *Id*. Like Particle, "Meltwater's creation of the index permit[ted] its subscribers to search for and request delivery of information that is responsive to their search queries." *Id*. Meltwaters customers "receive[d] emails every weekday that contain the excerpts responsive to their standing search requests. These are labeled "News Reports."..." *Id*. Again, this is exactly what Particle does, only in the form of a "news feed" which appears on its free app.

> Each search result in the News Report generally includes the following text: (1) the headline or title of the article and a hyperlink to the URL for the website from which the article was indexed; (2) information identifying the article's source, such as the publisher and the country of origin; and (3) usually two excerpts from the article. The first excerpt consists of up to 300 characters[1] (including white space) from the opening text of the article or lede. The second excerpt is shorter and is known as the "Hit Sentence." It is approximately 140 characters (not including white spaces) "surrounding a single, algorithmically chosen appearance of one of the customer's matched search keywords." If the keyword appears in the lede, then the lede is repeated twice.

---

[1] Note the distinction between a "character" count (meaning letters and spaces) and a word count, which Particle used. If the average word in an Emmerich article is only six letters long, 50 words with spaces in between would exceed Meltwater's limits.

12

*Id*. at 545. Again, the similarity to what Particle does is undeniable, except that Particle goes even further by including an exact copy of any accompanying photo, along with the headline and text.

Finally, Meltwater included a number of bells and whistles under the name of "Dashboard Analytics" or "Mail Analytics" which enabled the user to perform additional searches, including "ad hoc" searches. *Id*.

Particle attempts to make hay out of the fact that Meltwater made money by requiring its subscribers to pay a fee for this service, while Particle only makes money by charging for ads which run alongside the stories it distributes. This is a distinction without a difference. Particle purloined Emmerich's articles in order to profit from republishing them. Furthermore, the fact that Particle is free means that its distribution (and, by extension, the damage it causes) will be far greater than Meltwater could have dreamed.

Like Particle, Meltwater equated itself with internet "search engines," and argued that "search engines transform the work they take from internet news sites by using that content for a new purpose, that is, as an integral part of an information-location tool." Id. at 541. The Meltwater Court concluded that, even if search engines do serve a transformative purpose, Meltwater did not meet the definition of a search engine for a variety of reasons which apply equally to Particle. Meltwater's search feature worked as follows:

> Each search result in the News Report generally includes the following text: (1) the headline or title of the article and a hyperlink to the URL for the website from which the article was indexed; (2) information identifying the article's source, such as the publisher and the country of origin; and (3) usually two excerpts from the article. The first excerpt consists of up to 300 characters (including white space) from the opening text of the article or lede. The second excerpt is shorter and is known as the "Hit Sentence." It is approximately 140 characters (not including white spaces) "surrounding a single, algorithmically chosen appearance of one of the customer's matched search keywords." If the keyword appears in the lede, then the lede is repeated twice.

Id. at 545.

**D.     Emmerich has demonstrated a significant adverse impact on the market for his copyrighted work resulting from Particle's actions.**

13

The fourth fair use factor considers "the effect of the use upon the potential market for or value of the copyrighted work." Returning to MidlevelU in its discussion of this factor,

> Finally, we consider "(1) the extent of the market harm caused by the particular actions of the alleged infringer, and (2) whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market." (*citing Cambridge Univ. Press* , 769 F.3d at 1275). . . . Market harm is "a matter of degree," and so the importance of this factor varies with the relative strength of the other factors. *Id*. We mostly concern ourselves with the adverse impact of market substitution. *Id*. "<u>The central question ... is not whether [the defendant's] use of [the plaintiff's] works caused [the plaintiff] to lose some potential revenue," but instead "whether [the defendant's] use—taking into account the damage that might occur if 'everybody did it'—would cause substantial economic harm."</u> Id. at 1276. In other words, is the marketability of the copied work materially impaired by the copying?

(emphasis added) *Midlevelu*, 989 F.3d 1223. Emmerich has offered specific evidence that its revenues were adversely impacted by Particle's actions. Wyatt Emmerich testified to "innumerable conversations between our ad reps and advertisers about why they won't buy an ad because they have cheaper alternatives through the ad networks" which deal with Particle. *See* Emmerich Depo 152:6-9. He testified to a decline in operating revenue since Particle began operations from $22.5 million down to $14.5 million. *See* Emmerich Depo. 179:4-6. He testified that "since NewsBreak stopped stealing our stuff, our revenue stabilized for the first time in three or four years." *See* Emmerich Depo. 184:15-17. Emmerich's unrefuted testimony on this point clearly establishes the fourth fair use factor in his favor.

## **CONCLUSION**

Particle would have the Court believe the four fair use factors all fall squarely in its favor. Nothing could be further from the truth. Particle stole and republished Emmerich's

articles for a clear commercial purpose. Its claim of "transforming" the articles is an obvious fig leaf to conceal the fact that its entire business model is built on unfairly monetizing the work of others. It has not demonstrated that it is a "search engine" like Google or Apple and, even if it is technically an "aggregator" this does not automatically allow it to invoke the doctrine of fair use. The registered works contain a mixture of fact and creative writing which, at worst, leads to a neutral conclusion and, at best, favors Emmerich. The amount and substantiality of the content stolen from Emmerich and republished on NewsBreak's news feed exceeds anything which has been approved as fair use by any other Court. Emmerich has shown undisputed evidence of an adverse impact on his revenues resulting from Particle's actions.

FOR THE FOREGOING REASONS, Particle's motion should be denied.

RESPECTFULLY SUBMITTED, this the 17th day of May, 2022.

EMMERICH NEWSPAPERS, INCORPORATED

BY: /s/ <u>Wilson H. Carroll</u>
     Wilson H. Carroll (MSB#5894)

OF COUNSEL:
Wilson H. Carroll
WILSON CARROLL, PLLC
2506 Cherry Street
Vicksburg, Mississippi  39180
(601)953-6579
wilson@wilsoncarroll.com

## CERTIFICATE OF SERVICE

I hereby certify that I have this day filed the foregoing document via the Court's automated filing system, which automatically sent a copy to all counsel of record.

Dated: May 17th, 2022.

                                    <u>/s/Wilson H. Carroll</u>
                                    Wilson H. Carroll